893 So.2d 488 (2003)
William A. SNYDER, alias Corky Snyder
v.
STATE of Alabama.
CR-99-1356.
Court of Criminal Appeals of Alabama.
October 31, 2003.
Rehearing Denied February 27, 2004.
*503 Jeb Stuart Fannin, Talladega; Mark Smith Nelson, Talladega; and Sonya M. Rudenstine, Montgomery, for appellant.
William H. Pryor, Jr., atty. gen., and George A. Martin, Jr., and Henry M. Johnson, asst. attys. gen., for appellee.

On Remand from the Alabama Supreme Court
PER CURIAM.
The appellant, William A. Snyder, was convicted of four counts of capital murder for murdering Nancy Burkhalter, Dixie Gaither, and her son, Carey Gaither, during the course of a burglary and for killing two or more people pursuant to one course of conduct, violations of § 13A-5-40(a)(4) and 13A-5-40(a)(10), Ala.Code 1975. Snyder asked the jury to sentence him to death. The jury, by a vote of 10 to 2, recommended that Snyder be sentenced to death. The trial court then sentenced Snyder to death.
In March 2001, this Court reversed Snyder's convictions based on the Alabama Supreme Court's decision in Ex parte Minor, 780 So.2d 796 (Ala.2000)  in which the Supreme Court held that when evidence of prior convictions is admitted the trial court must give a limiting instruction on the use of the evidence. See Snyder v. State, 893 So.2d 471 (Ala.Crim.App.2001). In December 2001, the Alabama Supreme Court reversed our judgment, dramatically limiting its earlier holding in Minor. That court then remanded this case for further proceedings. See Snyder v. State, 893 So.2d 482 (Ala.2001). We now address the remaining issues on return to remand.
A multitude of witnesses testified in this case. The State's evidence tended to show the following. On August 11, 1995, the bodies of Dixie Gaither and Carey Gaither were discovered in Dixie Gaither's home on Stockdale Road in Talladega County. On that same day Nancy Burkhalter's body was discovered in her home, which was adjacent to Gaither's home.[1] The coroner testified that the Gaithers both died of multiple blunt-force injuries to the head and that Burkhalter died of three gunshot wounds to the head. Jewelry and a .38 caliber handgun had been taken from Gaither's home. Burkhalter was killed with the .38 caliber handgun that was stolen during the robbery-murders of the Gaithers.
After Dixie Gaither failed to report for work at a local McDonald's fast-food restaurant, her supervisor went to Dixie's house. When he saw that the door had been damaged he telephoned the police. Officer Bob Curtis of the Talladega Police Department discovered the two bodies in the living room  Carey's body was lying across Dixie's feet. Captain Joe Hare of the Talladega Police Department found *504 Nancy Burkhalter's body in a bedroom in her home. Snyder's fingerprints were discovered on a soft-drink can found in Burkhalter's house.
While police were manning a barricade near the crime scenes Snyder approached one of the officers and told her that he had been trying to telephone Dixie for two days and he hoped that she had not been murdered. The officer said that Snyder appeared nervous. Snyder knew all three victims and did odd jobs for Dixie Gaither. He said that immediately before the murders he had mowed a portion of her yard.
Claude "Butch" Snyder, Snyder's brother, was reluctant to testify and was treated as a court witness  he was called as a witness by the court so both parties could cross-examine him. See Rule 19.3(a)(1), Ala.R.Crim.P. Butch testified that on August 11 when he returned to the house he shared with Snyder, Snyder was crying. Butch said that Snyder told him about the authorities' finding the three bodies. Butch had made a sworn statement to police in which he said that he was with Snyder when he disposed of a .38 caliber gun, a pair of tennis shoes, and several cartridges immediately after the murders. He also said that he accompanied Snyder to Georgia where Snyder "got rid" of some jewelry. Butch also testified that he told police that his brother said on their way to Georgia, "I did it."
Gary Creek, Snyder's uncle, worked at pawnshop in Georgia. He testified that after the murders Snyder came to his house in Georgia and asked him if he could help him sell some jewelry. Creek and his girlfriend agreed to buy the jewelry. After the murder investigation focused on Snyder, Creek's girlfriend turned the jewelry over to the Cobb County, Georgia, police. The jewelry was identified as having belonged to Dixie and Carey and was valued at approximately $8,800.
Snyder owned a pest-control business at the time of the murders and was employed by a local apartment complex. Around the time of the murders a worker at the apartment complex saw Snyder dispose of a bag in one of the garbage dumpsters in the complex. Police discovered a purse wrapped in towels inside that dumpster. The purse was similar to the one Dixie carried and some of its contents were identified as having belonged to Dixie.
After Snyder was seen disposing of something in the dumpster where Dixie's purse was found, the police obtained a search warrant for his house. A search revealed a reindeer necklace that was identified as Dixie's. Behind Snyder's house police discovered shell casings that matched the .38 caliber handgun that was used to kill Burkhalter. Some distance from his house police discovered the handgun that was used in the murder.
Snyder testified in his own behalf; he told the jury that he was framed. He said that on August 9 he saw a truck parked outside Dixie's house and he went to Dixie's door and saw that the door had been kicked in. He went inside and discovered the bodies. He said that he checked to see if Dixie and Carey were alive and that as he was leaving two masked men grabbed him, put a gun under his chin, and pulled the trigger a few times. They knocked him out. He said that the two men then put the items taken from Gaither's house in his truck. Snyder admitted that he took a container of jewelry into his house and went through the contents and that was why, he said, the reindeer necklace was found in his house  it had dropped out of the bag and he had put it on his television.
The jury chose not to believe Snyder's rendition of the events; instead it convicted him of three counts of capital murder *505 for murdering the victims during the course of a burglary and one count of capital murder for murdering three people during one course of conduct.
A separate sentencing hearing was held before the jury. See § 13A-5-46, Ala.Code 1975. At the hearing Snyder waived the presentation of any mitigating evidence and urged the jury to sentence him to death. The jury, by a vote of 10 to 2, recommended that Snyder be sentenced to death. The trial court then directed that a presentence report be prepared. See § 13A-5-47(b), Ala.Code 1975. After the report was completed, the trial court conducted a separate sentencing hearing. See § 13A-5-47(c). The trial court then sentenced Snyder to death. Synder's appeal, which is automatic in a case where the defendant has been sentenced to death, followed. See § 13A-5-53(a), Ala.Code 1975.

Standard of Review
Because Snyder has been sentenced to death we are obliged to search the record for "plain error." See Rule 45A, Ala.R.App.P. Rule 45A states:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, when ever such error has or probably has adversely affected the substantial right of the appellant."
When applying this standard, this Court has stated:
"As is the case with every death penalty case, this court is obliged, pursuant to Rule 45A, Ala.R.App.P., to review the transcript of the proceedings for plain error, whether or not the issue was raised before the trial court or on appeal. Plain error is defined as error that has `adversely affected the substantial right of the appellant.' The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is `particularly egregious' and if it `seriously affects the fairness, integrity or public reputation of judicial proceedings.' See Ex parte Price, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Johnson v. State, 620 So.2d 679, 701 (Ala.Cr.App.1992), rev'd on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993)."
Hall v. State, 820 So.2d 113, 121-22 (Ala.Crim.App.1999).
Many of the issues raised on appeal were not objected to at trial. While the failure to object will not bar our review of the issue in a death case, it will weigh against any claim of prejudice. Ex parte Smith, 756 So.2d 957 (Ala.2000).

Guilt-Phase Issues

I.
Snyder argues that he was denied his right to a speedy trial because there was a 49-month delay between his arrest and his trial.
The Sixth Amendment to the United States Constitution guarantees an accused *506 the right to a speedy trial. This section states:
"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense."
This right is likewise provided by the Alabama Constitution. See Art. I, § 6, Ala. Const.1901.
The United States Supreme Court in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), set forth four factors to be weighed when determining whether an accused has been denied the constitutional right to a speedy trial. They are (1) the length of the delay; (2) the reason for the delay; (3) the accused's assertion of his right to a speedy trial; and (4) the degree of prejudice suffered by the accused due to the delay.
Length of the delay. Snyder was arrested in November 1995. "The right to a speedy trial is triggered when a warrant of arrest is issued." O'Barr v. State, 639 So.2d 533, 535 (Ala.Crim.App.1993). Here, approximately 48 months elapsed from the time of Snyder's arrest until he was tried in November 2000. The Barker Court stated:
"The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance. Nevertheless, because of the imprecision of the right to speedy trial, the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case. To take but one example, the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge."
407 U.S. at 530-31, 92 S.Ct. 2182 (footnote omitted). A 48-month delay is presumptively prejudicial and will trigger an evaluation of the remaining factors in Barker. See Parris v. State, 885 So.2d 813 (Ala.Crim.App.2001) (40-month delay presumptively prejudicial); Howard v. State, 678 So.2d 302 (Ala.Crim.App.1996) (29-month delay presumptively prejudicial); Mansel v. State, 716 So.2d 234 (Ala.Crim.App.1997) (26-month delay presumptively prejudicial). But see Ex parte Apicella, 809 So.2d 865 (Ala.2001) (14-month delay not presumptively prejudicial). "The mere passage of time does not amount to the denial of a speedy trial." Haywood v. State, 501 So.2d 515, 517 (Ala.Crim.App.1986).
Reasons for the Delay. The record reflects the following relevant dates:
 November 1995 - Snyder arrested for offense
 February 1996 - Preliminary hearing
 May 1996 - Snyder indicted for capital murder
 May 1996 - Arraignment
 July 1996 - Snyder moved to have a mental examination and requested production
 of documents held in state custody
*507
 August 1996 - Snyder filed ex parte motion for funds to hire a mitigation expert
 October 1996 - Snyder filed motion for change of venue and motion for funds to hire
 expert to assist in the investigation
 January 1997 - Snyder filed motion for continuance so that mitigation expert could
 complete her evaluation
 June 1997 - Mental evaluation completed
 December 1998 - District attorney retired
 February 1998 - New district attorney appointed
 February 1998 - Snyder moved for new district attorney to recuse himself because of
 his prior knowledge of the case
 June 1998 - Snyder withdrew motion to recuse
 August 1998 - State files motion to continue so that it could have experts conduct
 tests on hairs found in Dixie Gaither's hand; motion was granted
 November 1998 - New district attorney elected
 December 1997 - Snyder files motion for a speedy trial
 January 2000 - Case called to trial
The record reflects that most of the delays were caused by motions filed by Snyder, not the State. "`Delays occasioned by the defendant or on his behalf are excluded from the length of delay and are heavily counted against the defendant in applying the balancing test of Barker.'" Zumbado v. State, 615 So.2d 1223, 1234 (Ala.Crim.App.1993), quoting McCallum v. State, 407 So.2d 865, 868 (Ala.Crim.App.1981). "To prevail on a speedy trial claim[, t]he accused must show purposeful and deliberate delay by the prosecuting authority." Pierson v. State, 677 So.2d 830, 831 (Ala.Crim.App.1996). The State did request a continuance to obtain tests on hairs discovered in Dixie's hand. However, "[t]he record does not indicate that the State attempted to delay the trial in bad faith or for an improper purpose." Sosa v. State, 591 So.2d 897, 900 (Ala.Crim.App.1991). In fact, Snyder, at one point in his brief to this Court states, "This delay was caused mostly by scheduling conflicts on all sides and the need for defense counsel to go to Virginia to interview the lab technicians who tested the hairs." (Snyder's brief at p. 128 n. 20.)
Assertion of Right. Snyder did not file a motion for a speedy trial until December 1998  over three years after he was arrested for the offense. "Although we recognize that it was not the appellant's responsibility to bring his cases to trial, the failure to assert his right at an earlier time tends to indicate that if any prejudice existed it was minimal. See U.S. v. Palmer, 537 F.2d 1287 (5th Cir.1976)." Stevens v. State, 418 So.2d 212, 214 (Ala.Crim.App.1982).
Prejudice suffered by the accused. Snyder makes no specific argument in his brief as to how he was prejudiced by the delay in this case. In fact, it appears that most of the delays were for his benefit so that he could strengthen his defense. *508 Based on the circumstances presented in this case, we conclude that Snyder's constitutional right to a speedy trial was not violated. See Zumbado v. State, 615 So.2d 1223 (Ala.Crim.App.1993).

II.
Snyder argues that the trial court erred in denying his motion seeking to have the district attorney recuse himself from prosecuting the case. Specifically, he argues that the district attorney should have recused himself because, before he was appointed district attorney, Snyder's parents had consulted him about representing their son in this capital-murder prosecution.[2]
The record reflects that in December 1997, the district attorney for Talladega County retired and in February 1998 the Governor appointed Jonathan Adams district attorney. In February 1998, Snyder filed a motion asking the district attorney to recuse himself because Snyder's mother, Betty Snyder, had previously met with him about representing her son. A hearing was held at which both Betty Snyder and Jonathan Adams testified. Betty Snyder testified that she met with Adams before he was appointed district attorney and talked with him for about 30 minutes. She said that she told him what Snyder had told her about the case. (She said that Snyder had told her that when he went into Gaither's house two men were there and knocked him on the head and put all of the items from her home in his truck.) Jonathan Adams said that Betty Snyder did not tell him any specifics about the case. He said that it was his policy when he was in private practice not to learn about the facts of the case until he had been retained. Adams also said that he told Betty Snyder his fee and she said she would get back with him. It is undisputed that Adams was not retained to represent Snyder. Adams was the district attorney from February 1998 until January 1999 when a newly elected district attorney took office after defeating Adams in the November election. Adams was not the district attorney who tried the case against Snyder. The record shows that the trial court took the matter under advisement; the following occurred at a later pretrial hearing:
"The Court: Anything on behalf of the defendant in the form of any additional testimony or comments relative to your motion to recuse that's pending with the Court?
"[Defense counsel]: Judge, in order to get this case tried, which we have been trying to do, we filed that motion out of an abundance of caution for the rights of the parties. Specifically Mr. Snyder's rights, and we discussed it with Mr. Snyder. He does not believe that there is a conflict, an actual conflict with Jon Adams handling this case. I can call him as a witness specifically for that purpose if the Court wants me to or I can just state that he has informed us he did not direct his mother to hire counsel to represent him. And he specifically did not direct her to go talk to Jon Adams. And if you want me to put him on just to testify to those points.
"The Court: That would be fine. Are you telling me that you want to put him on that particular issue and then withdraw your motion to recuse?
"[Defense counsel]: Yes, sir, that would be our intentions, but I think we would *509 need to put him on just for that purpose."
(R. 208-09.)
Snyder testified for the limited purpose of the motion to recuse. The trial court questioned Snyder as to whether he voluntarily waived any possible conflict on the part of the district attorney. "A defendant may validly waive his right to a conflict-free counsel if such a waiver is knowingly and intelligently made." M.S. v. State, 822 So.2d 449, 453 (Ala.Crim.App.2000). After an extensive colloquy the trial court accepted Snyder's request to withdraw the motion to recuse. It is clear that Snyder waived any possible conflict that might have existed.
Moreover, as we stated in Weaver v. State, 678 So.2d 260 (Ala.Crim.App.1995):
"`In Hannon [v. State, 48 Ala.App. 613, 266 So.2d 825 (1972)], the defendant conferred with a public defender who was later elected District Attorney. The District Attorney, however, did not take part in prosecuting his former client and did not give his assistants any information derived from conversations with the defendant. We affirmed this conviction, finding no breach of the attorney-client relationship.'"
678 So.2d at 274-75, quoting Terry v. State, 424 So.2d 710, 712 (Ala.Crim.App.1982). See Drinkard v. State, 777 So.2d 225 (Ala.Crim.App.1998) (no conflict of interest because attorney did not bring the case file to district attorney's office, he did not discuss the case, and he did not participate in the case). See also Smith v. State, 639 So.2d 543 (Ala.Crim.App.1993). Based on the cases cited above and the sparse record we cannot say that there was a conflict of interest.

III.
Snyder argues that the trial court failed to provide adequate measures to control the publicity in the case. He makes three different arguments in support of this contention.

A.
Snyder first argues that the trial court should have granted his motion for a change of venue. Snyder's motion for a change of venue stated:
"1. [Snyder] has been indicted for a capital offense that is punishable by death by electrocution.
"2. Newspapers in the Talladega County area have carried extensive and highly prejudicial material concerning the defendant and this case.
"3. Television and radio stations in the Talladega County area have broadcast similar prejudicial material concerning [Snyder] and this case.
"4. The pretrial publicity and word of mouth communication have created an inherently prejudicial atmosphere making the selection of a fair and impartial jury impossible.
"5. [Snyder] believes that the prejudicial attitudes are deep-seated and that he could not receive a fair trial in the present venue.
"6. Trial of [Snyder] in this venue will violate [Snyder's] right to a fair trial by an impartial jury as guaranteed by Article I, § 6 of the Alabama Constitution and the Sixth and Fourteenth Amendments of the United States Constitution."
(C.R. 369-70.) There were no exhibits attached to the motion  there were no copies of any media coverage of the case. The trial court deferred ruling on the motion until after the completion of voir dire examination. After voir dire the trial court asked if Snyder had any other grounds in support of his motion. No new *510 grounds were raised. The trial court stated:
"I am going to deny any motion for change of venue, and also would note there were numerous jurors in there that said good things about the defendant or said they had heard good things about the defendant. And the Court certainly doesn't believe that any pretrial publicity in this case would prejudice the defendant or impact on anything in the case. And the Court would further note that anybody that said they couldn't put something aside, even somebody that couldn't give a direct answer, I have granted those challenges and removed those people."
(R. 966-67.) Defense counsel then made the following comment, "Judge, If I could, our client has indicated he didn't want us to pursue the change of venue, other than the process we just went through. That's why we didn't offer anything additional." These comments show that counsel realized that he had not met his burden of proving that a change of venue was necessary.
"`Rule 10.1(a), Ala. R.Crim. P., states, "[T]he defendant shall be entitled to a change of the place of trial to the nearest county free from prejudice if a fair and impartial trial and unbiased verdict cannot be had for any reason." The burden of proof is on the defendant "to show to the reasonable satisfaction of the court that a fair and impartial trial and an unbiased verdict cannot be reasonably expected in the county in which the defendant is to be tried." Rule 10.1(b)....
"`....
"`"`The determination of whether or not to grant a motion for change of venue is generally left to the sound discretion of the trial judge, because he has the best opportunity to assess any prejudicial publicity against the defendant and any prejudicial feeling against the defendant in the community which would make it difficult for the defendant to receive a fair and impartial trial.' Nelson v. State, 440 So.2d 1130, 1132 (Ala.Cr.App.1983). See also Trahan v. State, 450 So.2d 1102 (Ala.Cr.App.1984)."
"`Burton v. State, 651 So.2d 641 (Ala.Cr.App.1993). The trial court's ruling on a motion for a change of venue will not be reversed absent an abuse of discretion. Sockwell v. State, 675 So.2d 4 (Ala.Cr.App.1993); Mullis v. State, 545 So.2d 205, 209 (Ala.Cr.App.1989); Knighten v. State, 507 So.2d 1015, 1021 (Ala.Cr.App.1986). To meet the burden of proof necessary to require a change in venue because of pretrial publicity, the defendant must show more than that the case generated widespread publicity. Oryang v. State, 642 So.2d 979 (Ala.Cr.App.1993).... "`It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.'" Ex parte Fowler, 574 So.2d 745, 747 (Ala.1990) (quoting Nelson at 1131); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).'
"Buskey v. State, 650 So.2d 605, 609-10 (Ala.Cr.App.1994). The trial judge questioned the veniremembers regarding their knowledge of the facts of this case. The lack of response he received when he asked which members of the venire were familiar with the case supports his denial of the motion for a change of venue."
Ex parte Windsor, 683 So.2d 1042, 1046 (Ala.1996).
Moreover, there is no indication from the voir dire examination that a change of venue was warranted. The prospective *511 jurors were questioned in 4 groups of 17. Several members in each group indicated that they had heard about the murders either at the time of the murders or in the week before jury selection. Each of the prospective jurors who answered that they had heard or read about the case was later individually questioned about his or her prior knowledge of the case. By far, the majority of the jurors remembered very little about the case and said that anything they had read or heard would not affect their ability to be impartial. Two indicated that they had fixed views about the case based on what they had read or heard. Those jurors were struck for cause. The remaining jurors all indicated that they could set aside anything they had read or heard and base their decision solely on the evidence presented at trial. When denying the motion for a change of venue, the trial court stated that the jurors' answers indicated no reason for granting the motion. A defendant "is not entitled to jurors who are totally ignorant of the facts and issues of the case." Ex parte Neal, 731 So.2d 621, 624 (Ala.1999). The proper means of determining whether pretrial publicity has rendered it impossible for a defendant to receive a fair trial is through voir dire examination. Duke v. State, 889 So.2d 1 (Ala.Crim.App.2002). "[A] change of venue will be granted only if the defendant shows that the pretrial publicity has `so pervasively saturated' the community `as to make the court proceedings nothing more than a "hollow formality."'" Neal, 731 So.2d at 624. There is no doubt that Snyder failed to make this showing. The trial court did not err in denying the motion for a change of venue.

B.
Snyder next argues that the trial court failed to control the pretrial publicity by failing to grant his motion for individual voir dire examination of the prospective jurors. The record reflects that the trial court did not deny the motion outright. The court allowed individual voir dire of those prospective jurors who has heard about the case.
As this Court has often stated:
"`In Alabama, there is no requirement that a defendant be allowed to question each prospective juror individually during voir dire examination. This rule applies to capital cases, and the granting of a request for individual voir dire is discretionary with the trial court. Browning v. State, 549 So.2d 548 (Ala.Cr.App.1989); Bui v. State, 551 So.2d 1094 (Ala.Cr.App.1988), aff'd, 551 So.2d 1125 (Ala.1989), vacated, [499] U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712 (1991). In the instant case, the trial court required the parties to submit proposed voir dire questions, and it decided which questions it would ask; however, the court did allow individual voir dire questioning of all veniremembers in reference to their views concerning the imposition of the death penalty. The record reflects a thorough and comprehensive voir dire examination of the prospective jurors. We conclude that the trial court did not abuse its discretion in its handling of the voir dire examination, and thus find no error.'"
Dorsey v. State, 881 So.2d 460, 481 (Ala.Crim.App.2001), quoting Coral v. State, 628 So.2d 954, 968 (Ala.Crim.App.), on remand, 628 So.2d 988 (Ala.Crim.App.1992), aff'd, 628 So.2d 1004 (Ala.1993).
Here, there is no evidence indicating that the trial court's method of conducting voir dire examination prejudiced Snyder. The trial court committed no error in denying Snyder's request for individual voir dire examination of the prospective jurors.

C.
Snyder argues that the trial court failed to control the publicity because he *512 allowed the jurors to separate each evening. He also states that it was error for the trial court to allow the jury to separate without his consent.
In 1997, before Snyder's trial, Rule 19.3(a)(1), Ala.R.Crim.P., was amended to provide the following:
"In the prosecution of any felony case, the trial court, in its discretion, may permit the jury hearing the case to separate during the pendency of the trial. Such a separation of the jury shall create a prima facie presumption that the accused was not prejudiced by reason of the separation."[3]
Section 12-16-9, Ala.Code 1975, states in part, "In the prosecution of any felony case the trial court in its discretion may permit the jury hearing the case to separate during the pendency of the trial."
It is now recognized that the trial court may permit the jury to separate without the consent of either party. See Ex parte Drinkard, 777 So.2d 295 (Ala.2000), and Ex parte Smith, 756 So.2d 957 (Ala.2000). Here, the trial court took every precaution to ensure that the jury was not subjected to any outside influence about the case. Each time the jury separated the judge admonished the members not to talk or listen to anything about the case. At some instances, upon returning to the courtroom, the trial court polled the jurors to make sure they had followed its instructions. The trial court did not err by allowing the jury to separate without Snyder's consent.

IV.
Snyder next argues that the trial court erred in forcing him to go through his trial wearing a "stun belt."
The record reflects that on the second day of trial Capt. Kilgore with the Talladega County Sheriff's Department informed the trial court that Snyder had told a fellow inmate who had passed the information to him that if the court proceedings did not go well he was going to take a take a gun from one of the officers in the courtroom. Because of those threats Capt. Kilgore recommended that Snyder wear a "stun belt." It appears from the testimony that this device was placed around the waist and had a battery pack attached to the back of the unit. The unit can be activated by remote control and, upon activation, temporarily incapacitates the wearer. The trial court went to great lengths to note for the record that the device was not visible  it was under Snyder's clothing. There is no indication that this device was ever used on Snyder.
"`"`Every court has power to preserve and enforce order in its immediate presence; to prevent interruption, disturbance, or hindrance to its proceedings; and to control all persons connected with a judicial proceeding before it."' Thomas v. State, 555 So.2d 1183, 1184-85 (Ala.Cr.App.1989), quoting Clark v. State, 280 Ala. 493, 497, 195 So.2d 786 (1967), appeal dismissed, cert. denied, 387 U.S. 571, 87 S.Ct. 2071, 18 L.Ed.2d 967 (1967). "`While recognizing that an accused generally has a right to be tried without being subjected to physical restraints, and that this right has been embodied in various constitutional and statutory guaranties, the courts have also recognized that this right is subject to exception, especially on such grounds as the need to prevent (1) the accused's escape, or (2) the accused's resort to violence, or (3) the accused's disruption *513 of the trial.'" Thomas, 555 So.2d at 1185, quoting Annot., 90 A.L.R.3d 17, 23 (1979).'
"Wood v. State, 699 So.2d 965, 966 (Ala.Cr.App.1997). See also Martin v. State, 51 Ala.App. 405, 286 So.2d 80, 84 (1973).
"In Campbell v. State, 484 So.2d 1168, 1170 (Ala.Cr.App.1986), this Court concluded that no abuse of discretion resulted from the trial court's requirement that the appellant be handcuffed during his trial. We noted that the appellant in that case `had substantial reason to attempt to escape, since he faced a sentence of life without parole, considering his five previous bank robbery convictions and the charges against him in this case.' See also McWilliams v. State, 640 So.2d 982 (Ala.Cr.App.1991), aff'd in part, remanded on other grounds, 640 So.2d 1015 (Ala.1993)."
Minor v. State, 780 So.2d 707, 784 (Ala.Crim.App.1999), rev'd on other grounds, 780 So.2d 796 (Ala.2000).
"`The trial court can best determine what security measures are necessary. "Within constitutional limits, great weight must be accorded the discretion of the trial court. The trial judge is responsible for maintaining order in his courtroom. He understands infinitely better than we what is necessary to perform his duty." Goodwin v. State, 495 So.2d 731, 733 (Ala.Crim.App.1986).'"
Duke v. State, 889 So.2d 1, 17 (Ala.Crim.App.2002), quoting Windsor v. State, 683 So.2d 1027, 1033 (Ala.Crim.App.1994), aff'd, 683 So.2d 1042 (Ala.1996).
The Alabama Supreme Court in 1877 recognized that there are instances when a defendant may lawfully be physically restrained during trial proceedings. See Faire v. State, 58 Ala. 74 (1877). Since that time we have upheld a trial court's decision to restrain disruptive or potentially disruptive defendants. See Goodwin v. State, 495 So.2d 731, 733 (Ala.Crim.App.1986) (upheld restraint of defendant who was a "repeat felon with a history of escape"); Martin v. State, 51 Ala.App. 405, 286 So.2d 80 (1973) (no error in ordering defendant who had escaped from federal prison to be restrained); Clark v. State, 280 Ala. 493, 195 So.2d 786 (1967) (upheld restraining defendant who attempted to escape during trial).
Though Alabama has not had occasion to consider the consequences of forcing a defendant to wear a "stun belt" during his trial, the Colorado Court of Appeals has addressed this question. See People v. Melanson, 937 P.2d 826 (Colo.Ct.App.1996). The Melanson court stated:
"Here, the trial court determined that security measures were necessary to ensure the safety of everyone in the courtroom. In so ruling, the court specifically noted defendant's history of violent crimes, that until being extradited to Colorado for purposes of this trial defendant was incarcerated in Kentucky for a violent felony, and that the charge in the present case was first degree murder.
"As a method of restraint, the People proposed the `stun' belt, a remotely activated device that is worn by a defendant around the waist and contains enough amperage to immobilize a person temporarily and cause muscular weakness for approximately 30-45 minutes. The device is not lethal and does not cause unconsciousness.
"After hearing testimony regarding the operation of the stun belt and a test of the belt conducted on one of the officers, the trial court concluded that, because it would remain hidden and obviated the need for armed guards, the belt was the least obtrusive way of ensuring courtroom safety and of preserving *514 the presumption of defendant's innocence and the appearance of his dignity.
"Moreover, in an effort to eliminate possible prejudice or harm to the defendant, the court ordered ample precautionary measures including that defendant be provided with a sport coat large enough to cover the belt completely.
"In our view, the trial court's decision that the physical restraint of defendant was necessary was not an abuse of its discretion. Although not all convicted felons are so dangerous and violent that they must be restrained at trial, see Lemons v. Skidmore, 985 F.2d 354 (7th Cir.1993), the court here set forth several reasons for the use of restraints and took extensive measures to guard against prejudice by the jury."
937 P.2d at 835. Compare State v. Flieger, 91 Wash.App. 236, 955 P.2d 872 (1998) (error in failing to conduct hearing on necessity of using "shock box"), and People v. Mar, 28 Cal.4th 1201, 1230, 124 Cal.Rptr.2d 161, 183-84, 52 P.3d 95, 114-15 (2002) ("Before a trial court approves the use of [a stun belt] in the future, the court must consider the foregoing factors and may approve the use of stun belt only if it determines that the use of the belt is safe and appropriate under the particular circumstances.").
The record shows that the trial court held a hearing and considered whether the information furnished was reliable and whether it was appropriate for Snyder to wear the device. It even advised Capt. Kilgore that he had to corroborate the information that he had received. Capt. Kilgore came back the next day with corroboration. We hold that the trial court did not err in directing that Snyder wear a "stun belt" during his trial.

V.
Snyder next argues that the trial court erred in failing to remove several prospective jurors for cause because, he argues, they admitted to being biased against Snyder.
When reviewing a trial court's ruling on a challenge for cause we must keep in mind the following:
"Even though a prospective juror may initially admit to a potential for bias, the trial court's denial of a motion to strike that person for cause will not be considered error by an appellate court if, upon further questioning, it is ultimately determined that the person can set aside his or her opinions and try the case fairly and impartially, based on the evidence and the law. Knop v. McCain, 561 So.2d 229 (Ala.1989); Siebert v. State, 562 So.2d 586 (Ala.Cr.App.1989), affirmed, 562 So.2d 600 (Ala.), cert. denied, 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 408 (1990); Perryman v. State, 558 So.2d 972 (Ala.Cr.App.1989). Only when a prospective juror's testimony indicates a bias or prejudice so fixed or deep-seated that that person cannot be impartial and objective must a challenge for cause be granted by the trial court. Knop, supra; Siebert, supra; Perryman, supra. Finally, a trial court's ruling on a motion to strike a juror for cause, based on an allegation of juror bias, is entitled to great weight and will not be disturbed on appeal unless it is shown that the court clearly abused its discretion. Forehand v. State, 624 So.2d 688 (Ala.Cr.App.1993); Siebert, supra."
Ex parte Land, 678 So.2d 224, 240 (Ala.1996). See also Ex parte Taylor, 666 So.2d 73 (Ala.1995).

A.
Snyder first challenges the trial court's failure to remove M.G. for cause because, he argues, she admitted that she thought he was guilty and that she would *515 hold it against him if he chose not to testify. Snyder used one of his peremptory strikes to remove this juror.
The Alabama Supreme Court has recently returned to the harmless-error analysis when reviewing a trial court's ruling on the refusal to remove a prospective juror for cause. The Alabama Supreme Court in Bethea v. Springhill Memorial Hospital, 833 So.2d 1, 6-7 (Ala.2002), stated:
"The application of a `harmless-error' analysis to a trial court's refusal to strike a juror for cause is not new to this Court; in fact, such an analysis was adopted as early as 1909:
"`The appellant was convicted of the crime of murder in the second degree. While it was error to refuse to allow the defendant to challenge the juror C.S. Rhodes for cause, because of his having been on the jury which had tried another person jointly indicted with the defendant, yet it was error without injury, as the record shows that the defendant challenged said juror peremptorily, and that, when the jury was formed the defendant had not exhausted his right to peremptory challenges.'
"Turner v. State, 160 Ala. 55, 57, 49 So. 304, 305 (1909). However, in Swain v. Alabama, 380 U.S. 202, 219, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), overruled on other grounds, Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court stated, in dicta, that `[t]he denial or impairment of the right is reversible error without a showing of prejudice.' (Emphasis added in Bethea].) Some decisions of this Court as well as of the Alabama Court of Criminal Appeals reflect an adoption of this reasoning. See Dixon v. Hardey, 591 So.2d 3 (Ala.1991); Knop v. McCain, 561 So.2d 229 (Ala.1989); Ex parte Rutledge, 523 So.2d 1118 (Ala.1988); Ex parte Beam, 512 So.2d 723 (Ala.1987); Uptain v. State, 534 So.2d 686, 688 (Ala.Crim.App.1988) (quoting Swain and citing Beam and Rutledge); Mason v. State, 536 So.2d 127, 129 (Ala.Crim.App.1988) (quoting Uptain).
"... [T]his Court has returned to the `harmless-error' analysis articulated in the Ross v. Oklahoma, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), and [United States v.] Martinez-Salazar, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000), decisions. Because a defendant has no right to a perfect jury or a jury of his or her choice, but rather only to an `impartial' jury, see Ala. Const.1901 § 6, we find the harmless-error analysis to be the proper method of assuring the recognition of that right.
"In this instance, even if the Betheas could demonstrate that the trial court erred in not granting their request that L.A.C. be removed from the venire for cause (an issue we do not reach), they would need to show that its ruling somehow injured them by leaving them with a less-than-impartial jury. The Betheas do not proffer any evidence indicating that the jury that was eventually impaneled to hear this action was biased or partial. Therefore, the Betheas are not entitled to a new trial on this basis."[4]
(Footnotes omitted.) See also Dailey v. State, 828 So.2d 340 (Ala.2001). As was the case in Bethea, Snyder offers no evidence that the jury impaneled was biased; therefore, if error did occur it was harmless.
*516 Even if we reached this issue, however, we would find no error. The record reflects that M.G. stated the following during questioning after admitting that she had read about the case:
"[Prosecutor]: Did you form any opinions about the case at all at that time?
"[M.G.]: No, just wondered. I can remember I said, well, why did he do that? Just like that. You know, I don't know about anything.
"[Prosecutor]: You saw it on TV, you read it in the newspaper. Could you put that knowledge aside, whatever  of course that's just the newspaper accounts and TV accounts of what happened. Could you put that aside and render a verdict strictly on the law and evidence as it comes to you from the witness stand and the Judges's charge as to the law?
"[M.G.]: Yes.
"....
"[Defense counsel]: Now, I think when [the prosecutor] was asking some questions earlier you indicated you thought that Mr. Snyder should testify on his own behalf.
"[M.G.]: Yes.
"[Defense counsel]: Is that right?
"[M.G.]: Yes. You want to know why I said that?
"[Defense counsel]: If the Judge told you that the law was that Mr. Snyder did not have to testify and you were not to hold it against him or any defendant if they didn't testify, could you go by the law that the Judge charged you?
"[M.G.]: Yes, on the evidence presented.
"[Defense counsel]: Yes, ma'am.
"[M.G.]: Yes.
"[Defense counsel]: Would you still think that Mr. Snyder should testify, even if the Judge told you he wasn't required to and it was his choice whether he testified or not?
"[M.G.]: No. But in my opinion  can I say whatI 
"The Court: Sure.
"[Defense counsel]: Yes, ma'am.
"[M.G.]: In my own opinion, if he can testify, I feel that he should, but if the Judge says he can't, then he can't.
"The Court: I am not going to say.
"[M.G.]: I am not saying, but isn't that what he just asked me if the Judge says that he is not allowed to testify?
"[Defense counsel]: No, ma'am. If the Judge told you that you were not to hold it against him if he did not testify.
"[M.G.]: Oh, I wouldn't hold it against him even if he didn't testify and I say he should, I wouldn't hold it against him. Just in my mind, it seems like he would want to testify for himself. I mean 
"[Defense counsel]: Okay. Do you think  having said that statement, can you put that belief you have aside and just base your knowledge on the law and evidence in the case?
"[M.G.]: Yes, I could."
(R. 733-35.) Clearly, this juror stated that she could put aside any opinion that she had and render a verdict based on the law. The trial court did not err in denying this challenge for cause.

B.
Snyder also argues that the trial court erred in failing to grant his challenge for cause of prospective juror D.M. because, he argues, her friendship with the prosecutor in the case prevented her from rendering an unbiased decision.
The record shows that this juror was questioned concerning her friendship with the prosecutor. She stated, on more than one occasion, that her friendship with the prosecutor and his wife would not affect *517 her ability to render an impartial decision in the evidence. (R. 883.) The trial court correctly denied this challenge for cause.
Moreover, Snyder removed this juror with one of his peremptory strikes; therefore, even if there was error, it was harmless. See Bethea, supra.
As part of this same argument Snyder contends that the trial court erred in failing sua sponte to remove two prospective jurors who indicated that they knew two of the prosecutors. Juror K.J. indicated that one of the prosecutors in the district attorney's office had handled a real-estate closing for him. Juror C.S. said that the former district attorney had drafted his will. The record shows that both jurors indicated that they could set aside any prior involvement with the prosecutors and render an impartial decision.
"The grounds for challenging a prospective juror for cause are set forth in § 12-16-150, Code of Alabama 1975. Here, no specific statutory ground existed to strike this juror for cause, so an `absolute bias' on her part must have been shown." Johnson v. State, 611 So.2d 506, 510 (Ala.Crim.App.1992). There was no reason for the trial court sua sponte to remove these jurors. There was no indication that these jurors had any absolute bias against Snyder. There is no plain error here.

C.
Snyder argues that the trial court erred in granting a challenge for cause of prospective juror J.M. who, he argues, had only a passing acquaintance with Snyder.
Snyder's argument in totally unsupported by the record. The record reflects that the following occurred during voir dire examination of J.M.:
"[Prosecutor]: Okay. [J.M.], if you were selected to serve in this particular case as a juror, could you put that knowledge aside of knowing him through that situation with your sister and working through that pest control with your sister's ex-husband, could you put that aside and render a verdict strictly on the law and evidence in this case?
"[J.M.]: No, sir, I am afraid I probably couldn't, because like I said, there are a lot of things tied up into that. And also it is awful hard for me to put that aside.
"[Prosecutor]: Okay. And I am not trying to  I am not trying to zero in on you, so to speak. I really need a yes or no if I can get it, and if I can't, that's okay too.
"[J.M.]: Uh-huh.
"[Prosecutor]: But again the question, could you put that knowledge of him aside and render a verdict strictly on the law and evidence in this case? Yes or no if you can.
"[J.M.]: I would have to say no."
(R. 878-79.) These were J.M.'s last comments. It is clear from reviewing the voir dire that this juror unequivocally indicated that she could not set aside her prior acquaintance with Snyder and render a decision based on the evidence. Her answers indicate that she had an "absolute bias," and she was correctly removed for cause.

D.
Snyder further argues that the trial court should have sua sponte removed prospective juror L.S. who, he argues, had personal knowledge of the case that biased her against Snyder.
The record shows that L.S. responded that her brother-in-law had worked with Snyder's ex-wife. She initially responded that she would feel uncomfortable sitting on the jury. However, upon further questioning she said that she did not have any reason for not sitting and that she could *518 put aside any knowledge that she had gained from her brother-in-law or any other source and render an unbiased decision in the case. Neither party moved to strike this juror for cause. There is no indication that this juror was biased; therefore, there was no reason to remove this juror for cause.

E.
Snyder argues that the trial court erred in failing to remove prospective juror L.N. because, he argues, she lied during voir dire when she failed to disclose that she had been wrongfully accused of a crime and she further failed to disclose that she knew one of the prosecutors.
The record fails to support Snyder's contention. The record reflects that during individual voir dire the trial court stated that L.N. had previously been charged with fishing without a license and had been found not guilty. However, defense counsel did note that L.N. raised her hand "hesitantly" when that question was asked, but she did raise her hand. The trial court stated that she did not volunteer any other information because no one asked her about any of the specifics of her prior conviction. (R. 872.) Also, L.N. was not asked if she knew one of the prosecutors. L.N. was asked if she was friends with any of the prosecutors. She had indicated during voir dire that she knew one of the prosecutors because she worked with his wife. The record does not reveal that this juror lied about questions put to her during voir dire examination.
Also, if any error did occur it was harmless because Snyder used one of his peremptory strikes to remove this juror. See Bethea.

VI.
Snyder argues that the trial court erred in failing to hold a hearing regarding alleged juror misconduct and that the trial court compounded the error by failing to remove the juror who committed the misconduct.
The record indicates that during individual voir dire of L.N. she indicated that another juror, J.P., had mentioned the case to her while they were in the bathroom at the courthouse. L.N. was questioned, and she indicated that J.P. did not mention any of the facts of the case  just that they might be serving on a jury in a murder case and the defendant's name. After this occurred, defense counsel said to the court: "We think she needs a little instruction on talking in the bathroom." (R. 883.) The trial court gave J.P. the following instruction,
"I want to let you know to be sure not to say anything about the case to anybody, don't let anybody talk to you about the case. If somebody asks you what is going on down here, don't tell them what case you are involved in or what we are doing. And if they ask you anything about it, just tell them you are under instructions from the Court not to mention it or discuss it."
(R. 884-85.) The court then asked both parties if they had any objections; both indicated that they were satisfied with the instruction.
Both parties agreed with the trial court's handling of the situation. Therefore, if error did occur it was invited by Snyder's own conduct. The doctrine of invited error applies to death-penalty cases and operates to waive any error unless the error rises to the level of plain error. See Whitehead v. State, 777 So.2d 781 (Ala.Crim.App.1999), aff'd, 777 So.2d 854 (Ala.2000). There is no evidence indicating that this juror disclosed information that was not known by all of the prospective jurors. L.N. told the trial court that she *519 did not discuss any of the facts of the case. There is no error, much less plain error, here.
Moreover, there was no reversible error because the record indicates that the State removed this juror by using one of its peremptory strikes. "Having the questionable juror struck by the State left [the defendant] in a better position than he would have been in had the trial court granted his challenge for cause, because it left the State with one less strike." Ex parte Jones, 520 So.2d 553, 554 (Ala.1988).

VII.
Snyder argues that his peremptory strikes were compromised when he was forced to substitute one of his peremptory strikes for a juror who failed to appear on the morning the jury was being struck.
The record reflects that one juror telephoned the clerk's office on the morning the jury was to be struck and informed the court that her son had a temperature of 102 degrees and she could not get anyone to take care of him until 12:00 p.m. that day. The trial court informed the parties and left it up to Snyder to decide about how he wished to proceed. Snyder's counsel then informed the court:
"Judge, we talked to Mr. Snyder, and he would agree, if the state agrees to this, that we remove one of our strikes, rather than the state doing that, or wait until noon. If the state won't agree to it, to remove one of ours, or we will wait until noon and see what happens with [the juror]. He doesn't want to restrike the entire panel."
(R. 992.) The following then occurred:
"The Court: Okay. Now, I will wait or start striking over. Your call. I am giving you the election to do whatever y'all want to do. I am not forcing you to do it. And, of course, it is 9:35 right now, and if y'all want to wait on [the juror], I will be more than glad to wait. Won't be any heartburn here.
"[Defense counsel]: Talk to [the defendant]one more time.
"The Court: I want to make absolutely sure. I don't want you to think I'm pressuring you to do it. It is 9:35 right now. I have got other things I can take up. The only thing I want to do is have my judicial assistant call [the juror] and make sure she could be here. And then, of course, if we start the case, just have to excuse her.
"The defendant: If we choose to wait on [the juror] and she doesn't show up, what will happen then?
"The Court: We won't be going anywhere. It will be over. Have to try it another day.
"All right. How do you gentlemen want to handle it now?"
(R. 993-94.)
Initially, we note that Snyder himself, after being questioned by the trial court, agreed to relinquish one of his peremptory strikes. Rule 18.4(f)(1), Ala.R.Crim.P., provides that there must be 36 prospective jurors when striking a jury for a capital case. See also § 12-16-100(a), Ala.Code 1975. This section states, in part:
"[T]he district attorney shall be required first to strike from the strike list the name of one juror, and the defendant shall strike one, and they shall continue to strike off names alternately until only 12 jurors remain on the strike list and these 12 jurors thus selected shall be the jury charged with the trial of the case. If any defendant shall refuse to exercise a strike to which he is entitled, then the judge presiding shall exercise that defendant's strike for him. The number of names appearing on the strike list upon commencement of striking, unless a lesser number is agreed to by the parties, *520 shall not be less than 36 if the offense charged is a capital felony nor less than 24 if the offense charged is a felony not punished capitally nor less than 18 if the offense charged is a misdemeanor or violation."
Alabama law provides that a capital defendant has the right to exercise 12 peremptory strikes to remove challenged prospective jurors from the venire. Here, Snyder was allowed 23 peremptory strikes. The United States Supreme Court in United States v. Martinez-Salazar, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000), stated:
"We answer today the question left open in Ross [v. Oklahoma, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988),] and hold that a defendant's exercise of peremptory challenges pursuant to Rule 24(b)[, Fed.R.Crim.P.,] is not denied or impaired when the defendant chooses to use a peremptory challenge to remove a juror who should have been excused for cause. Martinez-Salazar and his codefendant were accorded 11 peremptory challenges, the exact number Rule 24(b) and (c) allowed in this case. Martinez-Salazar received precisely what federal law provided; he cannot tenably assert any violation of his Fifth Amendment right to due process. See Ross, 487 U.S., at 91, 108 S.Ct. 2273."
528 U.S. at 317, 120 S.Ct. 774. See Evans v. State, 794 So.2d 411 (Ala.2000).
The facts in this case present an even stronger argument for finding harmless error than the facts presented to the United States Supreme Court in Martinez-Salazar. Here, Snyder was allowed more strikes than Alabama law provides. Thus, any error in his relinquishing one of his strikes was harmless because Snyder was using one of his "extra" peremptory strikes.
Moreover, there was no violation of Alabama law. The effect of Snyder's relinquishing one of his peremptory strikes was to reduce the venire to an odd number, thereby giving the State an additional strike. As we stated in Brooks v. State, 471 So.2d 507, 509 (Ala.Crim.App.1984), "In the case at bar, there was an odd number of jurors on the venire list. Since the State had the first strike, it had one additional strike more than the appellant," and "there is no requirement that each side have equal number of strikes." See § 12-16-100(a), Ala.Code 1975.

VIII.
Snyder next argues that the trial court committed error in calling Butch Snyder, Snyder's brother, as a "hostile witness." He argues that the trial court failed to show that Butch Snyder was unwilling to testify or that he was hostile. Snyder also raises several objections to the substance of Butch Snyder's testimony.

A.
The State moved that the court call Butch as a "court witness," not a "hostile witness," so that it could cross-examine him. Rule 19.2, Ala.R.Crim.P., gives the trial court the right to call a witness and to interrogate that witness. See also Rule 614, Ala.R.Evid.
Rule 19.2, Ala.R.Crim.P., states:
"(b) Court Witnesses.
"(1) Calling by Court. The court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called.
"(2) Interrogation by Court. The court may interrogate witnesses, whether called by the court or by a party.
"(3) Objections. Objections to the calling of witnesses by the court or to *521 interrogation by the court may be made at the time the witness is called or interrogation begins; provided, however, that the court shall give counsel an opportunity to make such objections outside the presence of the jury.
"(c) Hostile Witnesses. A party calling a witness may cross-examine the witness:
"(1) If the witness demonstrates hostility to the party calling the witness, or
"(2) If the testimony of the witness is necessary to prove a material matter essential to the case of the calling party and the party calling the witness is surprised by the testimony of the witness."
It appears that Rule 19.2 makes a distinction between a "court witness" and a "hostile witness." The rule does not provide that a court witness must be hostile before the trial court may call that witness. This view is also consistent with the majority of other courts that have addressed this issue. See State v. Anderson, 304 S.C. 551, 406 S.E.2d 152 (1991) (before court may call witness five prerequisites must be met: (1) the state will not vouch for the truthfulness or integrity of witness, (2) there is a close relationship between the accused and the witness, (3) there is evidence indicating that the witness was an eyewitness to alleged act, (4) the witness has previously given a sworn statement that he will probably contradict, (5) and the absence of the witness's testimony would result in a miscarriage of justice); Uhr v. Lutheran Gen. Hosp., 226 Ill.App.3d 236, 256, 589 N.E.2d 723, 737, 168 Ill.Dec. 323, 338 (1992) (court may call witness "`where a witness has testimony relevant to the issues and a miscarriage of justice might occur if the testimony is not brought to the attention of the fact-finder'"). Compare Nance v. State, 93 Md.App. 475, 613 A.2d 428 (1992) (court may call witness when there is closer relationship between witness and defendant, there are contradictory statements made by witness, the witness's testimony is necessary, the witness is hostile, the prosecution cannot vouch for credibility).
This Court in McCall v. State, 501 So.2d 496 (Ala.Crim.App.1986), discussed in detail those cases in which the trial court has called witnesses. Though the McCall opinion was released before January 1, 1991  the effective date of the adoption of the Alabama Rules of Criminal Procedure  the case is nonetheless instructive. The McCall Court stated:
"In Moulds v. State, 426 So.2d 942, 946 (Ala.Cr.App.1982), this Court held that the trial court did not abuse its discretion in having an apparent accomplice `declared a court's witness, or in effect a witness adverse to the prosecution, when it became apparent that ... [the accomplice-witness] was reluctant to testify.' In Lewis v. State, 414 So.2d 135, 138 (Ala.Cr.App.), cert. denied, 414 So.2d 140 (Ala.1982), this Court held that the trial court did not err in granting a prosecution's request to declare a witness a court's own witness where that witness was the defendant's fiance and had a role in concealing evidence of her father's killing. See also Wiggins v. State, 398 So.2d 780, 783 (Ala.Cr.App.), cert. denied, 398 So.2d 783 (Ala.1981) (no abuse of discretion in refusing defense request to have one of its witnesses declared a court's witness where `the witness apparently had no connection or relationship with the appellant either casually, socially, or otherwise' and the record did not reflect `any animosity or ill feelings between the witness and the appellant' and did `not indicate, other than through the statements of appellant's *522 attorney, that the witness was testifying differently from that which the appellant expected'); Lawrence v. State, 57 Ala.App. 639, 642, 331 So.2d 284 (1976) (following and stating general rule that `while it seems that it is within the discretion of a trial judge to honor a request by the defendant that a person be called as the court's witness, attempts to predicate error on a refusal by the trial court to grant such a request have been uniformly unsuccessful'); Helton v. State, 55 Ala.App. 428, 435, 316 So.2d 355 (1975) (no error in refusal to grant defense request to call witness as court's own witness where defense did not establish through voir dire examination of witness that witness was adverse, hostile, or would make contradictory statements); McCullough v. State, 40 Ala.App. 309, 314, 113 So.2d 905, cert. denied, 269 Ala. 698, 113 So.2d 912 (1959) (request that previously convicted and sentenced codefendant be called as court's witness because he `would be a reluctant witness' addressed to trial judge's sound discretion). See also Anderton v. State, 390 So.2d 1083, 1086-87 (Ala.Cr.App.), cert. denied, Ex parte Anderton, 390 So.2d 1087 (Ala.1980)."
501 So.2d at 502. See also Lett v. State, 625 So.2d 1192 (Ala.Crim.App.1993), which was released after the adoption of Rule 19.2, Ala.R.Crim.P.
Before the trial court called Butch Snyder to the stand, the State proffered that he was Snyder's brother, that they had lived together, that he had been uncooperative with the district attorney's office since he received a subpoena, that he had made contradictory pretrial statements, and that he admitted that he had lied in one of the prior statements. A review of Butch Snyder's answers to questions posed by the prosecutor reveals that he was evasive, uncooperative, answered many times that he did not know or he could not remember, and stated that he was scared that he was going to be charged with the murders. However, when questioned by the defense attorney he appeared very cooperative and eager to agree.
There is no provision in Rule 19.2 that the witness must first be determined to be hostile before the court may call the witness as a court witness. It is abundantly clear that the trial court did not err in calling Snyder's brother as a court witness based on his relation to Snyder, his prior inconsistent statements, and his motivation to lie based on his fear that he would be charged with the murders.[5]

B.
Snyder next argues that Butch Snyder's out-of-court statements constituted hearsay and were not within any exception to the general rule against hearsay and that, therefore, the statements should have been excluded.
Initially, we note that Snyder did not object to Butch Snyder's testimony; therefore, we are limited to determining whether there was plain error. Rule 45A, Ala.R.App.P. "By failing to object, the defendant has not waived this issue, although the failure to object does `weigh against Defendant as to any possible claim of prejudice.' Ex parte Bush, 431 So.2d 563, 565 (Ala.), cert. denied, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983)." Kuenzel v. State, 577 So.2d 474, 523 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991).
*523 As stated above, Snyder was called as a court witness; therefore, the State was allowed to cross-examine him. See Rule 19.2(b)(1), Ala.R.Crim. Butch Snyder had previously made three statements to police concerning his brother. In the first statement Butch Snyder denied any knowledge of any events that occurred around the time of the murders. In the second statement Butch admitted that he had lied in his first statement and that he had seen Snyder with a .38 caliber gun at the time of the murders, that he was with Snyder when he disposed of the gun in the woods, that Snyder also disposed of a pair of tennis shoes, that Snyder was very upset at the time of the murders, that he had gone to Georgia with Snyder and disposed of some jewelry, and that Snyder had also disposed of some cartridges. In the third statement Butch Snyder told police that he remembered that when they were driving to Georgia Snyder told him, "I did it."
Snyder argues on appeal that the prior statements should not have been introduced because they were hearsay and were not subject to any exception. Rule 801(d), Ala.R.Evid., provides, in part:
"(d) Statements That Are Not Hearsay. A statement is not hearsay if 
"(1) Prior Statement by Witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, or (B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive.
"(2) Admission by Party Opponent. The statement is offered against a party and is (A) the party's own statement in either an individual or a representative capacity...."
Though Butch Snyder's first and last statements were not given under oath, Snyder's second statement was given under oath. The record shows that before Butch gave his second statement, a secretary with the Talladega Police Department, who appeared to be a notary public, stated the following, "Butch, raise your right hand for me. Do you solemnly swear that the statements you are about to give will be the truth, the whole truth, and nothing but the truth so help you God? Butch answered, Yes mam [sic]." (S.R.137.)[6]
The majority of the evidence that was admitted came from Snyder's second statement. The evidence introduced from the last statement was that Snyder told his brother "I did it"; that was clearly an admission and not hearsay by definition. See Rule 801(d)(2), Ala.R.Evid.
The remaining portions of Butch Snyder's prior consistent statements were by definition not hearsay. See Rule 801(d)(1)(B), Ala.R.Evid.  it was "consistent with the declarant's testimony and [was] offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." As this Court has recognized, prior to the adoption of the Alabama Rules of Evidence:
"The general rule in regard to supporting a witness's credibility with a prior consistent statement is as follows:

*524 "`[T]he impeachment of a witness by the introduction of evidence that he has made a statement which is inconsistent with his testimony does not authorize the proponent of the witness to support his credibility by evidence that the witness has made a statement on another occasion of the same tenor as his present testimony. This is true whether or not the witness is a party, whether or not the witness admitted the making of the prior inconsistent statement, whether the witness denied making such statement and testimony that he made it came from the mouths of another witness and whether or not the prior similar statement was made before or after the time of the claimed inconsistent statement.'
"C. Gamble, McElroy's Alabama Evidence § 177-01(2) (3d ed.1977).
"There is, however, an exception to the rule, which is the following:
"`[I]f it is claimed that the witness' bias arose at a particular point of time, evidence that he, prior to such particular point of time, made a statement of substantially the same tenor as his present testimony is admissible. Stated differently, it is said that a witness charged with a motive or interest to misstate or misrepresent the facts concerning which he has testified, growing out his relation to the cause or to the litigant in whose behalf he gave testimony, may be supported and corroborated by proof that he made statements consistent and in harmony with his testimony, before that relation existed.'
"C. Gamble, McElroy's Alabama Evidence § 177.01(4) (3d ed.1977).
"In the case sub judice, Hawkins testified that appellant hit the victim several times with a gun, that he heard the gun discharge and that appellant ran away. On cross-examination Hawkins admitted that he then had several criminal charges pending against him, interjecting the possibility that he was biased toward the State in expectation of favorable treatment regarding those charges. Testimony of Detective Williams that Hawkins made a similar statement before the charges were brought was, therefore, admissible under the exception to the general rule in order to rebut the inference that Hawkins's testimony was manufactured. Zuck v. State, 57 Ala.App. 15, 325 So.2d 531 (1975), cert. denied, 295 Ala. 430, 325 So.2d 539 (1976); Yarbrough v. State, 105 Ala. 43, 16 So. 758 (1894)."
McDonald v. State, 448 So.2d 460, 462 (Ala.Crim.App.1984). Under McDonald, the prior consistent statements were admissible and were not hearsay. Butch Snyder had strong motivation not to tell the truth  he testified that he was afraid that he would be charged with the murders. The prior consistent statements were made before any formal charges were brought, and Butch Snyder was not subsequently charged with the murders. According to Rule 801(d)(1)(B), Ala.R.Evid., these prior consistent statements were not hearsay and were admissible. See also C. Gamble, McElroy's Alabama Evidence § 177.07(4) (5th ed.1996).
Also, Butch Snyder testified that when he was talking with detectives he was on drugs and had been drinking, that detectives told him that jewelry had been found in his truck and that he was scared, and that one detective stopped and started the tape all through questioning and talked to him while the tape was stopped. The prosecutor offered the tape recording of the last two statements to rebut Butch Snyder's allegations that he was coerced or had been incapable of making the statements to police. The second *525 and third statements were played to the jury after a detective testified that he did not tell Butch Snyder that jewelry was found in his truck, that Butch was not on drugs or intoxicated when he made the statements to police, and that he did not start and stop the tape during his questioning of Butch. This evidence was clearly offered to rebut the statements that Butch Snyder made while on the stand and to support the detective's testimony that Butch had not been coerced or incapable of making the statements to police.
"Generally, the proponent of a witness may not bolster the credibility of a witness by showing that he made similar statements on prior occasions. Macum [Marcum] v. State, 39 Ala.App. 616, 107 So.2d 899 (Ala.Cr.App.1958)."
Varner v. State, 497 So.2d 1135, 1137 (Ala.Crim.App.1986). However, we have also stated:
"The appellant cannot be heard to complain ... `"about exploration of the issue ... which he himself improperly injected into the trial." [Morgan v. State, 440 So.2d 1240, 1241 (Ala.Cr.App.1983)]. "Rebuttal evidence, even evidence of prior crimes, is generally admissible within the sound discretion of the trial court. Vincent v. State, 231 Ala. 657, 165 So. 844 (1936); Jones v. State, [362 So.2d 1303 (Ala.Cr.App.1978)]; Norris v. State, 429 So.2d 649 (Ala.Cr.App.1982)." Peterson v. State, 452 So.2d 1372 (Ala.Cr.App.1984).' Campbell v. State, 508 So.2d 1186, 1189 (Ala.Cr.App.1986)."
Walker v. State, 631 So.2d 294, 301 (Ala.Crim.App.1993). See also Butler v. State, 531 So.2d 52 (Ala.Crim.App.1988).
Last, even if the statements were erroneously admitted, their admission was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). As the United States Supreme Court stated in United States v. Hasting, 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983):
"In holding that the harmless-error rule governs even constitutional violations under some circumstances, [this] Court recognized [in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967),] that, given the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and that the Constitution does not guarantee such a trial....
"Since Chapman, the Court has consistently made clear that it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations.... The goal ... is `to conserve judicial resources by enabling appellate courts to cleanse the judicial process of prejudicial error without mired in harmless error.'"
461 U.S. at 508-09, 103 S.Ct. 1974 (footnote omitted). There was a plethora of evidence, both direct and circumstantial, pointing to Snyder's guilt. Therefore, even if Butch Snyder's sworn statements were improperly admitted, we can say without reservation that their admission was harmless beyond a reasonable doubt.
Based on the foregoing, Snyder has failed to show any error, much plain error.

C.
Snyder also argues that the trial court improperly allowed the introduction of opinion evidence on the ultimate issue of guilt  whether Snyder committed the murders.
There was no objection to this testimony during trial; therefore, we are limited to a *526 plain-error analysis. Rule 45A, Ala.R.App.P.
During Butch Snyder's testimony the prosecutor asked Butch if Snyder had said, "I did it." Butch denied that Snyder made the statement and said that Snyder actually said, "I've did it now." (R. 1108.) The prosecutor then confronted him with his prior statement to police. The following occurred:
"[Prosecutor]: When you were interviewed by Detective Pee Wee Hurst and Dennis Surrett, did you ever tell them that he said I did it. I did it. I have messed my life up now? Did you ever tell them that?
"[Butch Snyder]: No, sir, not that way.
"[Prosecutor]: You never told them that that way?
"[Butch Snyder]: Not that way, no, sir.
"[Prosecutor]: Okay. Let me ask you, when they got you down to talk to you at the police station, did they have a tape recorder on?
"[Butch Snyder]: Sure did.
"[Prosecutor]: And they asked you questions about what you said. Did you ever say, I did it. I did it now or that your brother said, I have messed my life up now? You deny saying that right now?
"[Butch Snyder]: I don't deny he said that, no, I don't. But he didn't say it during that time that you are trying to question me on it.
"[Prosecutor]: What I am asking you is did you tell Dennis Surrett that your brother said, I did it. I did it now. I have messed my life up. Did you or did you not tell him that?
"[Butch Snyder]: I told him that, yes."
(R. 1109-10.) It appears that Snyder may have made two statements to Butch Snyder. One statement may have been made while the two were walking to a shed behind their house and another statement may have been made on their way to Georgia. Butch Snyder did not dispute that he did tell police that his brother made the statement, "I did it." He only disputed the timing of the remark. This statement was an admission by the defendant and by definition was not hearsay  it was an admission. See Rule 801(d)(2)(A), Ala.R.Evid.

IX.
Snyder argues that the trial court failed to adequately cure any prejudice resulting from the State's failure to disclose certain evidence during discovery. The record shows that during trial the defendant discovered that Investigator Dennis Surrett had taken statements from Butch Snyder that were recorded. Surrett testified that before recording the statement he made some notes for his own reference during the questioning. It was disclosed during Surrett's testimony that the notes for the second and third statements were not disclosed to Snyder during discovery. The district attorney searched his files twice and was unable to locate Surrett's notes. Snyder argues that he was unduly prejudiced by the failure to disclose the notes and he is entitled to have his conviction reversed, he argues, because of this Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), violation.
It is clear that the State maintained an open-file discovery policy in this case. However, the evidence in this case was voluminous. The trial court directed the parties to identify each item of evidence that was disclosed during discovery. The list contains 373 different pieces of evidence. When it was discovered that the notes made by Surrett were not in the file, the trial court directed the district attorney *527 to search his files for Surrett's notes.[7] Part of the confusion in this case was caused by the fact that Surrett no longer worked for the district attorney's office and the fact that there had been three different district attorneys for Talladega County during the prosecution of this case. When the district attorney was unable to locate the notes, Surrett was questioned about the notes. The following occurred:
"[The Court]: You took three statements from Butch Snyder in this case; is that correct?
"[Surrett]: Yes, sir.
"[The Court]: All right. Is there any conflicting information that he provided you before the tape turned on that conflicts or contradicts in any way the subsequent taped conversation that would have gone with those notes?
"[Surrett]: To my knowledge, no, sir. I used those notes to construct a taped statement.
"[The Court]: In order to formulate the questions to receive the answers to put them in a proper order; is that correct.
"[Surrett]: That's correct.
"[The Court]: Okay. But you don't know of anything to your recollection that would have been in those written notes that conflicts or contradicts the taped recording that subsequently came after those written notes?
"[Surrett]: Not that I recall, no, sir."
(R. 1429-30.) The trial court then heard argument on the issue and stated:
"All right. Here is what we are going to do, your motion is denied and the Court believes that you do have a way to check it. The Court believes you can ask him in front of the jury if you want to, state can if they want to, if there are any differences. Obviously he doesn't have the notes today. He doesn't have them. You can ask him if there is any differences between the notes and what's on the statement. You can also call Butch Snyder back to the witness stand and ask Butch Snyder, who is the brother of the defendant in this case, and I will let that in. If Butch Snyder believes that anything he told [Investigator] Surrett, for the jury to weigh it and consider it, is different from the interview that wasn't taped that where [Investigator] Surrett would have taken notes down, you are more than welcome to call him back to this witness stand and ask him. And then the jury can determine the truth about it? So, Butch Snyder could be called back by either party, and you reserved the right to recall him, and ask him  in fact, y'all have got copies of the tapes and copies of the transcripts and certainly access to Butch Snyder. And you can have him look at those. You can put him back on later on and ask him, and then the jury can determine factually from that.
"....
"However, in this particular case, the Court doesn't find any prejudice that's worked toward this man at this present time, and I am going to allow you to go into an exhaustive cross-examination of [Investigator] Surrett on this issue. I will allow you to put Butch Snyder back up, and I believe Captain Hurst was present in some of these ..."
(R. 1435-37.) Snyder did not question Surrett about the notes, recall Butch Snyder, or question Capt. Hurst.
This Court in May v. State, 710 So.2d 1362 (Ala.Crim.App.1997), stated:

*528 "The Alabama Supreme Court, in Ex parte Gingo, 605 So.2d 1237 (Ala.1992), adopted the United States Supreme Court's position in Arizona v. Youngblood, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), regarding the allegations that the state failed to preserve evidence potentially useful to the defense:
"`"Unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Youngblood, 488 U.S. at 58, 109 S.Ct. at 337. "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." Youngblood, 488 U.S. at 57, 109 S.Ct. 333 (footnote), 109 S.Ct. at 337, 109 S.Ct. 333 (footnote), citing Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959).'
"605 So.2d at 1240-41. Gingo additionally recognized that a defendant's right to due process can be violated when the loss or destruction is of evidence so critical to the defense that its loss or destruction makes the trial fundamentally unfair. Id. (citing Youngblood, 488 U.S. at 67, 109 S.Ct. at 342).
"May has failed to establish that the loss or destruction of the bullet fragment and shell casing violated his right to due process under either theory recognized by Alabama law. May's allegation that the evidence was lost or destroyed in bad faith is completely without support in the record. Additionally, May has failed to demonstrate that the evidence was critical to the defense's case. The murder weapon was never recovered by the police. Even had the bullet fragment and the spent shell casing been subjected to ballistics tests, there was no weapon to which a ballistics test could conceivably match them. May's theory that more than one weapon was used at the scene based on evidence of only one shell casing and more than one bullet could still be illustrated by the photographs of the crime scene."
710 So.2d at 1369-70. In a similar case we stated:
"In Ex parte Dickerson, 517 So.2d 628 (Ala.1987), the Alabama Supreme Court addressed the issue of whether a defendant's rights under the Due Process Clause had been violated by the prosecution's failure to produce an allegedly exculpatory videotape. The police had erased the tape because they did not believe that the contents were relevant. Although bad faith apparently could not be attributed to the prosecution, the court stated that `under controlling authority, the good or bad faith of the prosecution is irrelevant.' Dickerson, 517 So.2d. at 630. The court determined that the defendant's right to due process had been violated by the State's destruction of a tape and stated:
"`It is not in the interest of justice to permit the prosecution, in its unfettered discretion, to determine the favorable or unfavorable nature of potentially exculpatory evidence, and then allow the prosecution to destroy the evidence, thereby forcing the defendant to establish the favorable nature of evidence that no longer exists. In the present case, since the prosecution was attempting to establish constructive possession of the pistol, the video tape would have been favorable to the defendant if it showed that the defendant was away from the car and that the car door was closed. Through inconsistent statements, the *529 police officers attempted to establish that the video tape was not favorable to the defendant because the tape depicted only a portion of the arrest scene. Additionally, the prosecution summarized that the video tape was immaterial because several officers had testified as to the same evidence that would have been depicted by the video tape.
"`The fact remains that the police officers intentionally destroyed the video tape after making their own determination as to its favorable or unfavorable nature. This act substantially impaired the defendant's ability to establish the favorable nature of the evidence and violated the defendant's right to due process.'

"Dickerson, 517 So.2d. at 630-31. (Emphasis added.) However, this court in State v. Gingo, 605 So.2d 1233 (Ala.Crim.App.1991), reversed a lower court's pre-trial order suppressing the results of tests on allegedly hazardous material. The trial court suppressed the test results after it was discovered that the material that was the subject of the tests, had been destroyed. This court, relying on the United States Supreme Court decision in Arizona v. Youngblood, 488 U.S. 51[, 57], 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988), held:
"`The Due Process Clause of the Constitution of the United States did not require the suppression of the test results. "[W]hen we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant," the good or bad faith of the State is relevant. Arizona v. Youngblood, 488 U.S. 51 [at 57], 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988). "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Youngblood, 488 U.S. at 58, 109 S.Ct. at 337. "The presence or absence of bad faith by the police for purposes of the [D]ue Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." Youngblood, 488 U.S. at 57 n.[*], 109 S.Ct at 337 n.[ *]. See also, United States v. Galvan-Garcia, 872 F.2d 638, 641 (5th Cir.), cert. denied, [493] U.S. [857], 110 S.Ct. 164 [107 L.Ed.2d 122] (1989). See generally, W. LaFave and J. Israel, 2 Criminal Procedure § 19.5 (Supp.1991).'
"State v. Gingo, 605 So.2d at 1233. We concluded that `Youngblood overruled Dickerson by necessary implication,' 605 So.2d at 1236, and that the defendant had failed to show any bad faith on the part of the prosecution and that, therefore, the trial court should not have suppressed the test results. This judgment, however, was reversed by the Alabama Supreme Court.
"The Alabama Supreme Court distinguished the facts giving rise to the appeal in Gingo from the facts in Youngblood and concluded:
"`Although to show bad faith, for the purpose of showing [a] due process violation, the defendant must show that the State had knowledge of the exculpatory value of the destroyed evidence, "there may well be cases in which the defendant is unable to prove that the State acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair." *530 Youngblood, 488 U.S. at [61, 109 S.Ct. at 339] (Stevens, J., concurring in the result).'
"Ex parte Gingo, 605 So.2d 1237, 1241 (Ala.1992) (emphasis added).
"The court concluded that Gingo was such a case.
"In this case, the appellant contends that he did not meet with NeCaise and that he did not sell him any drugs. He contends that the tape would have shown that the person with whom NeCaise spoke was not him.
"While we concede that it is possible that an examination of the tape recording could have revealed that someone other than the appellant had sold NeCaise marijuana, we are not prepared to say that the tape recording was so critical that the police's destruction of the evidence rendered a fair trial impossible. The appellant seems to contend that the tape recording was the only way he could demonstrate his innocence. We are not so persuaded. The appellant did testify at trial to the effect that he did not sell NeCaise marijuana; however, he did little to refute the State's version of the facts. He did not present any witnesses nor indicate his whereabouts on the day the drug sale occurred. Rather, he merely testified that he was not involved and named other persons who might have been involved.
"The State, however, presented the testimony of NeCaise, who identified the appellant as the person who had sold him the drugs. He testified that the person who had sold him the drugs had had a deformed arm. The appellant, by his own admission in court, indicated that he had cerebral palsy and that it affected the use of his arm. Additionally, NeCaise testified that the appellant emphasized that NeCaise was to call him `Jimmy,' and both NeCaise and Carraway heard other people call the appellant `Jimmy,' which in fact is his name. Further, Carraway testified that he eventually recognized the voice speaking to NeCaise as that of the appellant. As noted above, he had met the appellant on one prior occasion. Carraway testified that Necaise was able to identify a photograph of the appellant from a group of photographs, which incidentally, included the photographs of B.S. and B.F., two persons that the appellant testified might have been involved in the crime. As the United States Supreme Court stated in Youngblood, `unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.' Youngblood, 488 U.S. at 58, 109 S.Ct. at 337. Here, the appellant has failed to show bad faith on the part of the police. The officers testified that the tape was erased because, they believed, it did not contain any part of the conversation during the drug transaction between the appellant and NeCaise. The police stated that the tape recorder was not monitored after they learned that a drug buy from the intended target would not take place. We fail to see how the police could be said to have acted in bad faith when there was no apparent exculpatory significance to this tape recording.
"Thus, we conclude that the appellant's rights under the Due Process Clause were not violated by the destruction of the tape recording between the appellant and Necaise."
Grissom v. State, 624 So.2d 706, 708-10 (Ala.Crim.App.1993). Here there is no evidence of bad faith on the part of the State. Neither is there evidence that the notes were so critical that their loss made Snyder's trial fundamentally unfair. There is no reason to apply the *531 Ex parte Gingo, 605 So.2d 1237 (Ala.1992), exception in this case. Snyder is not entitled to a new trial.

X.
Snyder next argues that the evidence seized as a result of the execution of a search warrant on his house should have been suppressed because, he argues, the affidavit in support of the warrant failed to supply probable cause. The affidavit was very detailed; it read as follows:
"My name is W.E. Hurst. I am the Captain of Detectives for the City of Talladega Alabama, Police Department. On August 11, 1995, the Talladega Police Department received a complaint at about 9:38 A.M. at the residence of Dixie T. Gaither, located at 4131 Stockdale Road in Talladega, Alabama. Upon arrival by officers of this department the bodies of Dixie T. Gaither and Carey Gaither were located in the sitting room area of the residence. Both Dixie T. Gaither and Carey Gaither had been beaten about the head. The residence was searched for evidence as well as documented for items of value that could be missing. It has been determined through interviews of family members, friends, and employer of the Gaithers that a .38 caliber revolver, a white gold watch with blue face and diamond-like dial, a yellow gold rose ring with a diamond in the center, a yellow gold band with three diamonds, a diamond solitaire pendant, a white gold cluster ring, a yellow gold cluster ring and a baby's ring, a ladies purse, white in color, with straps and several zippered compartments, a man's square cluster with at least five diamonds and various types of prescription drugs prescribed for Carey Gaither are missing from the persons of Dixie T. Gaither and Carey Gaither as well as from the residence. I have been informed by the Alabama Department of Forensic Sciences that the Gaithers were beaten to death with a blunt-type object. About 200 yards from the Gaither residence is located another residence known to have been shared by Carey Gaither and his girlfriend, Nancy Burkhalter. Upon inspection, the body of Nancy Burkhalter was located in the bedroom of the said residence. It also appeared she had been beaten about the head with an unknown object. The autopsy and cause of death is incomplete. I have talked with David Craven, manager at McDonald's [fast-food restaurant] in Talladega. He states that Dixie Gaither was to have reported to work at 2:00 P.M. on Thursday, August 10, 1995. That Dixie Gaither failed to come to work and that evening he called her residence and received no answer. I have personally talked to Randall Dixon, an employee of Talladega Downs housing project and he told me that on August 11, 1995, at about 4:00 P.M. he saw Corky Snyder dispose of something in a dumpster located outside the Talladega Down office. That Corky Snyder was driving a Ford truck, blue in color, and bears a star with the wording `Pest Patrol' on the doors. That officers, while on the scene control at 4131 Stockdale Road, observed Corky Snyder at the scene on at least one occasion on August 11, 1995. That I instructed David Sparks, an officer with the Talladega Police Department to conduct a search of the dumpster heretofore described. At about 3:45 P.M. on August 12, 1995, Sparks retrieved from the above described dumpster a semi-clear bag containing a towel, the towel contained a white colored purse and contents which included a heart-shaped compact, several tubes of lipstick, combs, pens, cough drops and other assorted items. That on August 12, 1995, at approximately 5:30 P.M. I instructed Jimmy Kilgore *532 and Bill Kennedy, investigators for the Talladega County Jail where it was secured inside the sally port adjoining the jail and the secured dumpster heretofore described would be visible from the roadway. Bill Kennedy, Howard Bussie and Jimmy Kilgore of the Tallladega County Sheriff's Department observed Corky Snyder's truck ride by the location of where the dumpster heretofore described had been secured. Howard Bussie followed the truck of Corky Snyder and watched it go to Talladega Downs apartments and Howard Bussie told me he observed the truck drive into the location from where the dumpster had been seized. Howard Bussie, Jimmy Kilgore and Bill Kennedy followed Corky Snyder's truck to Wal-Mart [discount store] of Talladega and they observed Corky Snyder exit the truck heretofore described and enter Wal-Mart. Jimmy Kilgore and Bill Kennedy later observed Corky Snyder exit Wal-Mart with a bag in his possession. That at 5:12 P.M. on August 12, 1995, Gwen Tinney, a sister-in-law of Dixie T. Gaither viewed the purse and contents and that she positively identified the heart-shaped compact as belonging to Dixie T. Gaither, and identified the purse as being similar to one Dixie Gaither owned. That on August 12, 1995, I personally interviewed Corky Snyder and he informed me that he disposed of his mother's trash on Thursday, August 10, 1995. That the trash bag was green or black and it was half full and he put it in the dumpster located outside the office of Talladega Downs. Corky Snyder further informed me that he went to the residence of Dixie Gaither on Wednesday, August 9, 1995, that he arrived there between 5:30 and 5:45 P.M. and started cutting grass. That he had a conversation with both Dixie and Carey Gaither. He states he left about 7:00 P.M. and arrived at this home, hereinafter described, at 7:15 P.M. I then spoke with Corky Snyder's mother and she informed me that Butch, Corky's brother, picked up her trash on Wednesday. That Corky had not picked up her trash and she further gave me a trash bag like the ones she uses and it is clearly marked `Don't Mess with Texas' in white letters. That she does not use white/clear trash bags. That David Sparks and Andy Yarbrough as stated searched the dumpster heretofore described and found no garbage bag with the lettering `Don't Mess with Texas.' That after the discovery of the items in the dumpster at Talladega Downs, surveillance was begun on the residence of Corky Snyder. That David Sparks and Andy Yarbrough saw Corky Snyder put something in his truck which he removed from his residence. In my interview with Corky Snyder, he denied removing anything from his residence and placing it into his vehicle. Corky Snyder also told me that he had made a purchase of Pinesol, trash bags, air freshener and chlorine tablets while in Wal-Mart that evening, prior to our conversation. Butch Snyder and Corky Snyder share the same residence. Butch Snyder drives a primer colored truck with ladder racks on it, which Butch Snyder told me Corky Snyder owns; however Butch said he was buying the truck from Corky. That in the bed of the truck is a large green/black trash bag as well as two semi-clear trash bags. Alan Watson, a police officer has personally known Corky Snyder for some time and did, in fact, live beside him for a period of time and he told me that Corky Snyder ran his business `Pest Patrol' out of his residence and that Corky Snyder had recently separated from his wife and had established a new residence. The telephone number given to me by *533 Corky Snyder as his residence is the same as his business phone number. This was confirmed by me with South Central Bell information as well as Corky Snyder's yellow pages ad for `Pest Patrol.' Ken Sisk, an officer with Talladega Police Department, confirmed with Alabama Power Company that Corky Snyder had established service at the hereinafter described residence on June 20, 1995. Said residence is located in the City of Talladega, Alabama, by beginning at the intersection of East Street and North Street in Talladega, Alabama, and traveling on North Street which turns into Alabama Highway 21 to a driveway on the right side of the road. Said residence is further described as follows, to-wit: a single story wood frame house, beige in color with blue trim. Based on the foregoing facts set out herein, I have probable cause to believe and do believe that evidence of the heretofore mentioned crime is being continually possessed and stored at the above residence and premises. I respectfully request that a search warrant be issued for the above described @residence, premises and out buildings."
(S.R.263-65.)
In determining whether probable cause exists, we have stated:
"`"`"For a search warrant to be sufficient and satisfy the constitutional requirement of probable cause, the affidavit upon which it is based must state specific facts and circumstances which support a finding of probable cause." Carter v. State, 405 So.2d 957, 959 (Ala.Cr.App.), cert. denied, 405 So.2d 962 (Ala.1981).' Callahan v. State, 557 So.2d 1292, 1304 (Ala.Cr.App.), affirmed, 557 So.2d 1311 (Ala.1989), cert. denied, 498 U.S. 881, 111 S.Ct. 216 [112 L.Ed.2d 176] (1990). `Probable cause to search a residence exists when "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. [213], 103 S.Ct. [2317] at 2332, 76 L.Ed.2d 527 (1983).' United States v. Jenkins, 901 F.2d 1075, 1080 (11th Cir.), cert. denied, 498 U.S. 901, 111 S.Ct. 259 [112 L.Ed.2d 216] (1990).... [T]here is no requirement of a `showing that such a belief be correct or more likely true than false. A "practical, nontechnical" probability that incriminating evidence is involved is all that is required.' Texas v. Brown, 460 U.S. [730] at 742, 103 S.Ct. [1535] at 1543, [75 L.Ed.2d 502 (1983)]. Additionally, `where a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical rather than a common sense manner, and should resolve doubtful or marginal cases according to the preference to be accorded to warrants.' Maddox v. State, 502 So.2d 779, 785 (Ala.Cr.App.1985), affirmed in part, remanded on other grounds, 502 So.2d 786 (Ala.), cert. denied, 479 U.S. 932 [107 S.Ct. 404, 93 L.Ed.2d 357](1986)."
"`See also, Witcher v. State, [629] So.2d [71] (Ala.Cr.App.1993).'
"Moore v. State, 650 So.2d 958, 965 (Ala.Crim.App.1994), cert. denied, 650 So.2d 966 (Ala.1994).
"The record shows that the judge issuing the search warrant relied entirely on the affidavit; the officer presenting the affidavit did not supplement its contents orally. (R. 56). This affidavit was based on information from a confidential informant who had given reliable information on a number of previous occasions. The text of the affidavit gave the issuing judge `a fair probability that contraband or evidence of a crime will be *534 found in a particular place,' specifically, # 10 Les Chateaux Apartments. Moore v. State, 650 So.2d at 965; Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).
"`An issuing judge's determination that sufficient probable cause existed to support the warrant is "entitled to great deference and is conclusive in the absence of arbitrariness." United States v. Pike, 523 F.2d 734 (5th Cir.1975), reh'g denied, 525 F.2d 1407, cert. denied, 426 U.S. 906, 96 S.Ct. 2226, 48 L.Ed.2d 830 (1976).'
"Wamble v. State, 593 So.2d 109, 110 (Ala.Crim.App.1991)."
Drake v. State, 668 So.2d 877, 879-80 (Ala.Crim.App.1995).
"`Probable cause deals with probabilities, not legal technicalities. It is grounded upon those practical, factual considerations of everyday life upon which reasonable and prudent men act. Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1948).' Carter v. State, 405 So.2d [957] at 959 [(Ala.Crim.App.1981)]. `Probable cause does not require an officer to compile an airtight case against a suspect. Rather, it deals with the probable consequences of all the legitimate facts considered as a whole.' Williams v. State, 440 So.2d 1139, 1145 (Ala.Cr.App.1983)."
Callahan v. State, 557 So.2d 1292, 1304-05 (Ala.Crim.App.1989).
The affidavit in support of the search warrant supplied more than sufficient probable cause. The affidavit stated that on the day of the murders Snyder was seen disposing of something in a dumpster located at Talladega Downs housing project  where Snyder was employed. A search of the dumpster revealed a purse  some of the contents of which were later identified as having belonged to Dixie Gaither. Snyder had been observed at the crime scene and passing the location where the dumpster had been impounded. Snyder was also observed removing something from his residence and when questioned about it he lied to police. Certainly, there was probable cause to issue a search warrant for Snyder's residence; therefore, anything seized as a result of the execution of the warrant was correctly received into evidence at trial.

XI.
Snyder next argues that the trial court erred in not allowing him to present evidence of another person's guilt. Specifically, Snyder argues that the trial court erred in refusing to allow him to present hearsay evidence concerning conversations witnesses had with Carey Gaither and Nancy Burkhalter about Eugene Singleton's possible connection to the murders.
In excluding this hearsay evidence, the trial court relied on this Court's decision in Griffin v. State, 790 So.2d 267 (Ala.Crim.App.1999), which was the law when Snyder was tried in February 2000. However, after Snyder was convicted, the Alabama Supreme Court, in Ex parte Griffin, 790 So.2d 351 (Ala.2000), reversed our decision and recognized that there may be situations when hearsay evidence of another's guilt is admissible against a claim that it violates the hearsay rule of evidence. The Alabama Supreme Court in Ex parte Griffin set forth a three-part test for determining whether such evidence is admissible. In Ex parte Griffin, the Alabama Supreme Court stated:
"The United States Supreme Court has held that a defendant has a right to put on a defense and that that right includes the opportunity to present evidence proving that another person committed the offense for which he has been charged. See *535 Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). However, this right is not absolute; instead, the trial court will have to consider the admissibility of such evidence in conjunction with other legitimate interests involved in the trial process. Chambers, 410 U.S. at 295, 93 S.Ct. 1038; see also Guam v. Ignacio, 10 F.3d 608 (9th Cir.1993). As a result, the trial court is presented with a balancing test in order to determine whether the evidence of a third party's culpability is properly admissible:
"`The court must weigh the defendant's "strong interest in presenting exculpatory evidence" against the state's interest "in promoting reliable trials, particularly in preventing the injection of collateral issues into the trial through unsupported speculation about the guilt of another party."'
"United States v. Johnson, 904 F.Supp. 1303, 1311 (M.D.Ala.1995) (citations omitted). In weighing those interests, the federal courts have required the defendant to show that the evidence he is offering is probative and not merely speculation that would confuse the jury:
"`To satisfy this balancing test, there must be "some showing of a nexus between the other party and the particular crime with which a defendant is charged." Of course, this nexus must be substantial  that is, probative  and not tenuous or merely speculative.'
"Id. (citations omitted).
"Like the federal courts, Alabama courts have long recognized the right of a defendant to prove his innocence by presenting evidence that another person actually committed the crime. See Ex parte Walker, 623 So.2d 281 (Ala.1992); Thomas v. State, 539 So.2d 375 (Ala.Crim.App.1988); Green v. State, 258 Ala. 471, 64 So.2d 84 (1953); Underwood v. State, 239 Ala. 29, 193 So. 155 (1939); Orr v. State, 225 Ala. 642, 144 So. 867 (1932); Houston v. State, 208 Ala. 660, 95 So. 145 (1923); Tennison v. State, 183 Ala. 1, 62 So. 780 (1913); McGehee v. State, 171 Ala. 19, 55 So. 159 (1911); McDonald v. State, 165 Ala. 85, 51 So. 629 (1910). In addition, Alabama courts have also recognized the danger in confusing the jury with mere speculation concerning the guilt of a third party:
"`It generally is agreed that the defense, in disproving the accused's own guilt, may prove that another person committed the crime for which the accused is being prosecuted.... The problem which arises in the application of this general rule, however, is the degree of strength that must be possessed by the exculpatory evidence to render it admissible. The task of determining the weight that must be possessed by such evidence of another's guilt is a difficult one.'
"Charles W. Gamble, McElroy's Alabama Evidence § 48.01 (5th ed.1996). To remove this difficulty, this Court has set out a test intended to ensure that any evidence offered for this purpose is admissible only when it is probative and not merely speculative. Three elements must exist before this evidence can be ruled admissible: (1) the evidence `must relate to the "res gestae" of the crime'; (2) the evidence must exclude the accused as a perpetrator of the offense; and (3) the evidence `would have to be admissible if the third party was on trial.' See Ex parte Walker, 623 So.2d at 284, and Thomas, 539 So.2d at 394-96.
"....
"The State makes an additional argument as to Embry's guilty plea. It apparently *536 argues in its brief that, even if the evidence of the plea passes the three-pronged test, at Griffin's trial Embry's plea is still hearsay that does not fall within any exception. Professor Gamble has stated:
"`The accused cannot ... prove the guilt of another by the use of hearsay statements. This hearsay ban constitutes the major barrier to exculpatory evidence, particularly in the form of a third party's confession to the crime with which the accused is charged. Such a statement could surmount a hearsay objection if it qualifies under some hearsay exception.'
"McElroy's Alabama Evidence, § 48.01(1). However, Gamble also notes that a situation could arise where `an accused's constitutional right to present his defense would dictate admission of evidence suggesting another's guilt.' Id. The United States Supreme Court has encountered such a situation, where the defendant's due-process rights conflicted with the rules of evidence. In Chambers, the Court stated: `In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.' 410 U.S. at 302, 93 S.Ct. 1038, 35 L.Ed.2d 297.
"....
"... [W]e follow the United States Supreme Court's holding in Chambers and hold that Griffin's constitutional rights supersede the hearsay rule in the Alabama Rules of Evidence. However, in doing so, we note that not in every case will the defendant's right to present his defense supersede the hearsay rule; it will supersede that rule only in those cases that, as indicated by the first two elements of the test stated above, have a probative alternative theory of culpability and not an alternative theory that is merely speculative and meant only to confuse the jury."
790 So.2d at 353-55 (some emphasis in original some emphasis added).
When this issue was presented, the trial court allowed Snyder to make an extensive offer of proof. Snyder sought to admit evidence indicating that in late 1982 or early 1983 Dixie and Milton Gaither[8] cooperated with police and that Milton Gaither testified against Eugene Singleton's codefendant; that Eugene Singleton pleaded guilty and had been sent to prison; that Singleton was released in 1994; that the district attorney had sent a deputy to the Gaither's house in 1995 to see if Eugene had contacted them; that the Gaithers were scared; and that Singleton had been seen in the Talladega area at the time of the murders.
When ruling on the admissibility of this evidence the trial court allowed the defense to question the forensic expert who examined the hairs found in Dixie Gaither's hand. This expert testified that he compared the hairs recovered to both Euguene Singleton's hair and Snyder's hair and that the hair had some similarities with Singleton's but that it contained more dissimilarities. The trial court also allowed Snyder to put on any "fact witness" who could testify that Singleton had been seen in the Talladega area around the time of the murders. The trial court stated:
"[Y]ou do not have a right to put them up and go into those conversations with Burkhalter and Carey Milton Gaither. In fact, neither Nancy Burkhalter or *537 Carey Milton Gaither, Jr., had anything to do with testifying in a case that occurred in 1983. And, in fact, it is obvious to this Court that Eugene Singleton was paroled in 1994 and had been out some period of time based on the records of the Department of Corrections that was submitted on the motion. And this happened more than a year later on. It is obvious to this Court that a law enforcement person went out there as a courtesy and directive from the district attorney, told those people had you heard from Eugene Singleton? No, we haven't heard from him. Call us if you do. No conversations, no notice of any threats, no nothing."
(R. 2838.)
The trial court heard many witnesses on Snyder's proffer in this case. Several witnesses testified concerning remarks Snyder had made to them about Eugene Singleton. One witness even appeared to perjure himself; understandably, his testimony was given little weight by the trial judge. (The trial judge personally questioned the witness as to whether he was aware that he could be charged with perjury.) Another witness, the only witness who had personally spoken with Eugene Singleton, testified that Singleton said, "Just hello, how have you been, and what's been going on with you. Just general conversation. And then he says that he wouldn't have ever thought that Dixie and them would have done him that way. That he hoped he just got on with his life and never seen them again." (R. 2712.) Yet another witness, a police officer, testified that when he spoke with the Gaithers after Singleton had been out of prison for several months they told him that they had not heard from Singleton.
In order for evidence to be admissible under Ex parte Griffin, the party offering the evidence must show (1) that the evidence relates to the res gestae of the crime; (2) that the evidence excludes the accused as a perpetrator of the offense; and (3) that the evidence would have been admissible if the third party had been on trial. It appears that the proffered evidence failed to meet the Ex parte Griffin test. Most glaringly, the evidence did not exclude the accused as the perpetrator of the murders. Moreover, the credibility of the vast majority of the evidence was dubious at best. "[T]he tendency of this evidence to mislead the jury substantially outweighed its probative value in the case." Ex parte Hall, 820 So.2d 152, 157 (Ala.2001). The trial court committed no error in excluding this questionable testimony  it would only have confused the jury.

XII.
Snyder argues that the trial court erred in allowing the State to put on evidence of his prior bad acts. Specifically, Snyder argues that it was error for the State to admit audiotapes of Butch Snyder's statements to police that included a reference that the appellant had previously stolen jewelry.

A.
Initially, we observe that there was no objection to this evidence; therefore, we are limited to reviewing this issue for plain error. Rule 45A, Ala.R.App.P.
"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."
Rule 404(b), Ala.R.Evid.
Relying on the Alabama Supreme Court's decision in Ex parte Drinkard, 777 So.2d 295 (Ala.2000), Snyder argues that because evidence of collateral bad acts was *538 wrongfully admitted he is entitled to a new trial.
However, what Snyder fails to mention is that the Alabama Supreme Court has stated that whether the admission of such evidence constitutes reversible error must be determined on a case-by-case basis. As the Alabama Supreme Court stated in Hunter v. State, 802 So.2d 265, 270 (Ala.Crim.App.2000):
"`Whether the improper admission of evidence of collateral bad acts amounts to prejudicial error or harmless error must be decided on the facts of the particular case.' R.D.H. v. State, 775 So.2d 248, 254 (Ala.Crim.App.1997); Hobbs v. State, 669 So.2d 1030 (Ala.Crim.App.1995). The standard for determining whether error is harmless is whether the evidence in error was `harmless beyond a reasonable doubt.' Schaut v. State, 551 So.2d 1135, 1137 (Ala.Crim.App.1989), citing Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)."
Snyder testified on direct examination that he had previously pleaded guilty to theft of property in the second degree. The prosecutor did not unduly emphasize the prior bad act. Moreover, the trial court gave the jury the following limiting instruction:
"Now, there has been some testimony offered to the effect that a witness prior to taking the witness stand during this trial has been convicted of a crime. This testimony is allowed to go to you for one purpose, and that is for your consideration in determining what credibility you will give a witness's testimony from the witness stand in this case. This is for your consideration along with all the other factors in determining whether a witness is worthy of belief in what he says form the witness stand."
(R. 3511.) Given the circumstances of this case, we believe that any error that may have occurred was harmless.[9]

B.
Snyder also argues, in regard to the admission of evidence of his prior felony theft conviction, that the trial court erred in allowing him to be impeached with evidence of the conviction because the conviction was too remote  the conviction occurred more than 10 years before his trial.
Snyder was tried after the Alabama Supreme Court adopted the Alabama Rules of Evidence. Rule 609, Ala.R.Evid., addresses the use of prior convictions for purposes of impeachment. Rule 609(b), states, in part:
"Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed *539 for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction, more than ten years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence."
The record shows that defense counsel was given prior notice of the State's intent to use Snyder's prior conviction for impeachment purposes. Before Snyder testified, defense counsel objected, stating that according to Rule 609 the State could not use that conviction for impeachment purposes because it had been more than 10 years since the date of the conviction.[10] The trial court evaluated the evidence under Rule 609 and determined that the prior conviction would be admissible because, it "believe[d]" that it's certainly probative to the issues in this case, and the probative value would outweigh any potential prejudicial effect of the accused." (R. 3051.)
Before the adoption of Rule 609, Ala.R.Evid. this Court held:
"`[I]t is within the sound discretion of the trial judge to decide whether a conviction is too remote in time to have any present probative value toward showing the lack of credibility of the witness.' C. Gamble, McElroy's Alabama Evidence § 145.01(19) (4th ed.1991). At the time of the appellant's trial in January 1992, her larceny and forgery convictions were slightly over 13 years old and slightly over 12 and one-half years old, respectively. Both of these convictions were for crimes involving moral turpitude. See Ragland v. State, 238 Ala. 587, 192 So. 498 (1939) (grand larceny is a crime involving moral turpitude); Moton v. State, 13 Ala.App. 43, 69 So. 235 (1915) (forgery is a crime involving moral turpitude). We find no abuse of discretion in the trial court's admission of these convictions for impeachment purposes. See Ex parte Bankhead, 585 So.2d 112, 122 (Ala.1991) (no abuse of discretion in admission of 12-year-old convictions); McDaniel v. State, 365 So.2d 350, 351 (Ala.Cr.App.1978) (no abuse of discretion in admission of 17-year-old convictions). We observe that the admission of even 20 and 30-year-old convictions have been upheld. Davenport v. State, 50 Ala.App. 321, 278 So.2d 769 (1973); Lanier v. State, 43 Ala.App. 38, 179 So.2d 167 (1965)."
*540 Wilsher v. State, 611 So.2d 1175, 1184-85 (Ala.Crim.App.1992) (footnote omitted).
However, Rule 609(b) dramatically changed the law in regard to the use of prior convictions for impeachment purposes. Rule 609(b) places the power in the trial court to allow or disallow the use of the prior conviction if, it determines, the probative value exceeds the prejudicial effect of that evidence. Because Alabama has had little opportunity to address this issue we have looked to the federal courts for guidance.[11] The United States Court of Appeals for the Eleventh Circuit in United States v. Pritchard, 973 F.2d 905 (11th Cir.1992), stated:
"In United States v. Sloman, 909 F.2d 176, 181 (6th Cir.1990), the Sixth Circuit listed several relevant factors to be considered when deciding whether to admit evidence pursuant to Rule 609(b):
"1. The impeachment value of the prior crime;
"2. The point in time of the conviction and the witness' subsequent history;
"3. The similarity between the past crime and the charged crime;
"4. The importance of the defendant's testimony;
"5. The centrality of the credibility issue.
"Before admitting Pritchard's conviction, the district court considered these factors and determined that the probative value of the conviction outweighed the possible prejudice to Pritchard, because Pritchard's credibility was a key issue. We agree.
"Although the circumstantial evidence was strong, the only direct witness against Pritchard was Robert Abel, a convicted felony who had pleaded guilty to the robbery and was cooperating with the government. The crux of this case was a credibility issue, i.e. the credibility of Abel versus that of Pritchard. The jury had before it the criminal record of Abel. Thus, Pritchard's criminal record, or the absence thereof, took on special significance. See United States v. Brown, 603 F.2d 1022 (1st Cir.1979). We conclude that the district court correctly saw the credibility of Pritchard's own testimony as vital.
"Another important factor to consider is the government's need for the impeaching evidence. United States v. Cathey, 591 F.2d [268] at 276 [(5th Cir.1979)]. In this case, the government's need was substantial. Pritchard had no convictions within the ten years before the trial; the burglary conviction was not merely cumulative of other impeachment evidence. While the burglary conviction was more than ten years old, it was only thirteen years old."
973 F.2d at 908-09 (footnote omitted). The following federal courts have upheld the use of prior convictions older than 10 years for impeachment purposes. See United States v. Jefferson, 925 F.2d 1242 (10th Cir.1991); United States v. Portillo, 699 F.2d 461 (9th Cir.1982); United States v. Foley, 683 F.2d 273 (8th Cir.1982); *541 United States v. Brown, 603 F.2d 1022 (1st Cir.1979).
The record shows that the trial court and both attorneys had copies of the case action summary sheets relating to the prior conviction and appeared to be aware of the specifics concerning the conviction. Snyder's credibility was pivotal in the case because he denied committing the murders and offered his own explanation of how he came to be in possession of the stolen items. The prior conviction was only 12 years old  less than 12 years old if you do not count the period Snyder was on probation. Moreover, the State's need to present this evidence was great, given that Snyder had no felony convictions less than 10 years old. The trial court complied to the letter with the requirements of Rule 609(b), Ala.R.Evid., and correctly allowed the State to impeach Snyder with evidence of his prior felony theft conviction. We have been cited no reason, and indeed we can find no reason, to disturb the trial court's ruling.

XIII.
Snyder next argues that the trial court erred in allowing inflammatory photographs and videotapes of the crime scenes into evidence. Snyder contends that the photographs and videotapes were graphic, repetitive, and highly prejudicial.
Initially, we note that Snyder did not object at the time that any of the photographs was introduced into evidence. The record reflects that Snyder made a motion in limine, requesting that the trial court rule on the admissibility of the photographs and the crime-scene videotapes outside the presence of the jury. The trial court held that defense needed to object each time and that the court would then rule on the admissibility of the evidence. (R. 1019.) There were no objections made when any of the photographs were introduced into evidence; however, Snyder did object to the admission of the videotapes of the crime scenes. (R. 1487; 1622.)[12] Because there were no objections to the admission of the photographs we are limited to reviewing the admission of this evidence for plain error. See Rule 45A, Ala.R.App.P.
We have reviewed the photographs and videotapes of the crimes scenes and do not find them unduly gruesome or gory. They were relevant to show the extent of the victims' injuries and the scene of the crimes. See Ex parte Trawick, 698 So.2d 162 (Ala.1997); Ex parte Siebert, 555 So.2d 780 (Ala.1989); Smith v. State, 795 So.2d 788 (Ala.Crim.App.2000); Giles v. State, 632 So.2d 568 (Ala.Crim.App.1992), aff'd, 632 So.2d 577 (Ala.1993); Haney v. State, 603 So.2d 368 (Ala.Crim.App.1991), aff'd, 603 So.2d 412 (Ala.1992). Moreover, the crime-scene videotapes were correctly received into evidence to corroborate the officers testimony concerning the condition of the crime scenes when the bodies were discovered. See Stanton v. State, 648 So.2d 638 (Ala.Crim.App.1994). There was no error, much less plain error, in the admission of the photographs and the videotapes of the crime scenes and the victims.

XIV.
Snyder next argues that the trial court erred in allowing a multitude of exhibits to *542 be introduced without establishing their probative value. Specifically, he argues that the trial court failed to establish a sufficient chain of custody for numerous items of evidence.

A.
Snyder first argues that there was no testimony concerning the chain of custody for the audiotapes of Butch Snyder's last two statements to police. However, it is not necessary to establish a chain of custody for videotapes when a witness testifies that the contents of the audiotape were a reliable representation of the conversation. See Rule 901(a), Ala.R.Evid. See also Johnson v. State, 823 So.2d 1 (Ala.Crim.App.2001). Dennis Surrett testified that he was present when Butch Snyder made the statements and that the audiotapes were an accurate account of what transpired. This testimony was sufficient to admit this evidence; no formal chain of custody testimony was necessary.

B.
Snyder further argues that there was no chain of custody for the hairs removed from Dixie Gaither's hand during the autopsy because Dr. Kenneth Warner, state medical examiner, could not testify as to what happened to the hairs that were removed during the autopsy. He argues in his brief to this Court, "Dr. Walker's [[13]] testimony demonstrates the lax manner in which physical evidence was kept in this case." (Snyder's brief at page 136.)
Dr. Warner testified that hairs were collected from Dixie Gaither's body and then sealed and placed in an evidence locker at the laboratory. The hairs were then given to Mitch Rector in a sealed condition and transported to the Birmingham laboratory. The hairs were given to Gerald Burrow. Burrow testified that he gave the sealed evidence to Mary Holt  laboratory director for the Birmingham laboratory. Holt testified that she received the evidence from Burrow in a sealed condition and transferred the evidence to Charity Diefenback at Bode Laboratory in Virginia via United Parcel Service. Diefenback testified that she received the evidence from Holt in a sealed condition, and she subjected it to tests and then sent the evidence back to Holt in a sealed condition. It appears that the hair samples were also sent to John Case, who was employed by the Alabama Department of Forensic Sciences in the Jacksonville laboratory. He testified that he received the samples in a sealed condition from the Birmingham laboratory and that the evidence was then sent back in a sealed condition to the Birmingham laboratory after he completed his tests. "[E]vidence that an item has been sealed is adequate circumstantial evidence to establish the handling and safeguarding of the item." Lane v. State, 644 So.2d 1318, 1321 (Ala.Crim.App.1994).
It appears from the record that the trial court was aware that there was a problem in the chain of custody for the hair evidence, and it allowed the State to reopen its case to "tie the chain of evidence up." (R. 2824.) The chain was completed when John Case was recalled and allowed to testify concerning the chain of custody. There does not appear to be any breaks in the chain of custody for this evidence.[14]

*543 "`The purpose ... of establishing a chain of custody is to satisfy the court that it is reasonably probable that the exhibit is authentic and that no one has altered or tampered with the proffered physical exhibit.... A chain of custody only need be proved to a reasonable probability. One need not negate remote possibilities of substitution, alteration, or tampering with proffered physical evidence in order to establish a proper chain of custody.... In essence, what must be shown to introduce physical evidence is that the proffered item is the same object and that it is in substantially the same condition as it was at the commencement of the chain.'"
Riddle v. State, 669 So.2d 1014, 1018 (Ala.Crim.App.1994), quoting J. Colquitt, Alabama Law of Evidence § 9.1(c) at 484 (1990).
Moreover, as stated in § 12-21-13, Ala.Code 1975:
"Physical evidence connected with or collected in the investigation of a crime shall not be excluded from consideration by a jury or court due to a failure to prove the chain of custody of the evidence. Whenever a witness in a criminal trial identifies a physical piece of evidence connected with or collected in the investigation of a crime, the evidence shall be submitted to the jury or court for whatever weight the jury or court may deem proper. The trial court in its charge to the jury shall explain any break in the chain of custody concerning the physical evidence."
Furthermore, Snyder can show no error that affected his substantial rights. The hair samples collected from Dixie Gaither's hand were identified as not being consistent with Snyder's hair. Therefore, if any error did occur, which it did not, it was error without injury. See Rule 45, Ala.R.App.P.[15]
The remainder of Snyder's arguments on this issue merely consist of a laundry list of exhibits he contends were admitted without a proper chain of custody. He cites no specific reason as to why these exhibits were improperly admitted. We have reviewed the admission of all of the challenged evidence and find no reversible error. See Riddle v. State, 669 So.2d 1014 (Ala.Crim.App.1994).

XV.
Snyder next argues that numerous instances of prosecutorial misconduct denied him a fair trial.
"`In reviewing allegedly improper prosecutorial argument, we must first determine if the argument was, in fact, improper. If we determine that the argument was improper, the test for review is not whether the comments influenced the jury, but whether they might have influenced the jury in arriving at its verdict.' Smith v. State, 698 So.2d 189, 202-03 (Ala.Cr.App.1996), aff'd, 698 So.2d 219 (Ala.1997), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997) (citations omitted); Bush v. State, 695 So.2d 70, 131 (Ala.Cr.App.1995), aff'd, 695 So.2d 138 (Ala.1997), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 *544 L.Ed.2d 320 (1997) (citations omitted). `The relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process."' Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986), quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Comments made by the prosecutor must be evaluated in the context of the whole trial. Duren v. State, 590 So.2d 360, 364 ([Ala.Cr.App.1990), aff'd, 590 So.2d 369 (Ala.1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992). `Prosecutorial misconduct is subject to a harmless error analysis.' Bush v. State, 695 So.2d at 131 (citations omitted); Smith v. State, 698 So.2d at 203 (citations omitted)."
Simmons v. State, 797 So.2d 1134, 1161-62 (Ala.Crim.App.1999 (opinion on return to remand).
"`"While in argument to the jury, counsel may not argue as a fact that which is not in evidence; nevertheless, he may state or comment on proper inferences from the evidence and may draw conclusions from the evidence based upon his own reasoning. Sanders v. State, 423 So.2d 348 (Ala.Cr.App.1982); Speigner v. State, 369 So.2d 39 (Ala.Cr.App.), cert. denied, 369 So.2d 46 (Ala.1979); Liner v. State, 350 So.2d 760 (Ala.Cr.App.1977). The prosecutor, as does defense counsel, has a right to present his impressions from the evidence. Sanders, supra; Hayes v. State, 395 So.2d 127 (Ala.Cr.App.1980), cert. denied, 395 So.2d 150 (Ala.1981); McQueen v. State, 355 So.2d 407 (Ala.Cr.App.1978). He may argue every legitimate inference and may examine, collate, shift and treat the evidence in his own way. Sanders, supra; Hayes, supra; McQueen, supra. Liberal rules are allowed counsel in drawing inferences from the evidence in their argument to the jury, whether they are truly drawn or not. Sanders, supra; Liner, supra; Smith v. State, 344 So.2d 1239 (Ala.Cr.App.), cert. denied, 344 So.2d 1243 (Ala.1977). Control of closing argument rests in the broad discretion of the trial judge and, where no abuse of discretion is found, there is no error. Thomas v. State, 440 So.2d 1216 (Ala.Cr.App.1983); Robinson v. State, 439 So.2d 1328 (Ala.Cr.App.1983); Elston v. State, 56 Ala.App. 299, 321 So.2d 264 (1975). The trial judge can best determine when discussion by counsel is legitimate and when it degenerates into abuse. Hurst v. State, 397 So.2d 203 (Ala.Cr.App.), cert. denied, 397 So.2d 208 (Ala.1981); Garrett v. State, 268 Ala. 299, 105 So.2d 541 (1958)."
"`Sasser v. State, 494 So.2d 857, 859-60 (Ala.Cr.App.1986).
"`....
"`"Of necessity a wide discretion must be allowed the trial judge in regulating the argument of counsel. Trials are adversary in nature. Vigorous prosecution and defense is to be expected. Neither defense counsel nor the prosecutor should be too closely hampered by niceties of speech if he is to be effective, but should be permitted to say his say in his own style. This of course does not mean that unfair and prejudicial argument is to be condoned for one instant. All argument of counsel is to be measured in the background and atmosphere of courtrooms. And as stated in Arant v. State, 232 Ala. 275, 167 So. 540, 544, `Such statements are usually valued by the jury at their true worth ... and not expected to become factors *545 in the formulation of their verdicts.'"
"`Bullard v. State, 40 Ala.App. 641, 645, 120 So.2d 580, 584 (1960).'"
Perkins v. State, 808 So.2d 1041, 1116-17 (Ala.Crim.App.1999), quoting Taylor v. State, 666 So.2d 36, 64 (Ala.Cr.App.1994), aff'd, 666 So.2d 73 (Ala.1995).

A.
Snyder first argues that the prosecutor improperly argued facts not in evidence when he "interjected a reference to a third reindeer necklace that had never been presented in its own case," (Snyder's brief, p. 85), and when he mentioned State's exhibit number 196 in closing argument, an exhibit, Snyder argues, that was never offered or admitted at trial.
The record reflects that three reindeer necklaces were identified and received into evidence. Two reindeer necklaces were recovered from a purse found in a dumpster. They were in small plastic bags. A third reindeer necklace was recovered from the top of Snyder's television set in his house. Snyder was not cross-examined about any other reindeer necklace. What Snyder was questioned about was whether he could identify State's exhibit number 196  a small bag recovered from Butch Snyder's truck that had been torn or bitten at the end. Snyder stated during questioning that he assumed that the reindeer necklace discovered in his house had been in the small bag recovered from Butch Snyder's truck. Snyder had previously testified that he had gone through the jewelry when he got it out of his truck and that he thought that the necklace had fallen out of the bag. Moreover, in rebuttal the State offered Lt. Eugene Jacks's testimony. He identified State's exhibit number 196 as the small bag that had been found in Butch Snyder's truck as a result of the execution of the search warrant on Snyder's residence.
If any error did occur in mentioning the exhibit before it was formally identified it was at most harmless. "Testimony that may be apparently inadmissible may be rendered innocuous by subsequent or prior lawful testimony to the same effect or from which the same facts can be inferred." Yeomans v. State, 641 So.2d 1269, 1272 (Ala.Crim.App.1993). "The erroneous admission of evidence that is merely cumulative is harmless error." Dawson v. State, 675 So.2d 897, 900 (Ala.Crim.App.1995), aff'd, 675 So.2d 905 (Ala.1996). There was no reversible error here.

B.
Snyder next argues that the prosecutor used an irrelevant reenactment to prejudice him before the jury.
During Snyder's cross-examination the prosecutor handed him a shovel that had been introduced and identified as State's exhibit number 96 and asked him if could say how he threw the shovel into the woods. Snyder answered, "I don't really remember how hard or whatever I would have thrown it. I have got a pretty good baseball arm, but I don't know that I would have tried to throw it on the other side of the woods. I just wanted to get it into the woods. So, I don't particularly remember how I would have thrown it." (R. 3193.) Snyder argues that the shovel reenactment prejudiced him and that it should not have been allowed. First, there is no evidence in the record that Snyder physically demonstrated how he threw the shovel. (R. 3193.) Neither is there any objection to this evidence. There is no plain error here.
Also, during closing argument when the prosecutor was arguing that the lesser-included offense of felony murder was not *546 applicable in this case, the following occurred:
"There is nothing but intent. When you raise with that good baseball arm that he's got, when you raise that shovel up, or whatever object he used, and beat and broke the base of the skull of Dixie Gaither and crashed in the skull of Carey Gaither on top of his mama, that's an intentional killing. So, it is not an unintended death during the course of a felony."
(R. 3279-80.) Clearly, the prosecutor was arguing facts already in evidence when he said that Snyder had a "good baseball arm." Snyder himself testified to this during cross-examination.

C.
Snyder argues that the prosecutor instructed the jury that it could consider his prior theft conviction as substantive evidence of his guilt. Snyder's characterization of the prosecutor's argument is totally unsupported by the record. The prosecutor made the following argument in closing:
"Now, let's talk for a minute about Mr. William Snyder. First of all, the Judge is going to charge you that if anybody testifies from that witness stand and they have a prior conviction for a felony, that you can use that in weighing their testimony. And that you can  if they have been convicted of a prior felony, you can disregard their entire testimony or any portion thereof. And I submit to you that he took the stand and admitted that he had a theft conviction prior to taking that stand and testifying, and that gives  the Judge will tell you, you have that right as jurors to do so."
(R. 3287.)
Initially, we observe that there was no objection to this argument; therefore, we are limited to evaluating this issue for plain error. Rule 45A, Ala.R.App.P.
"`"This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful."' Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991), quoting Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987)."
Ferguson v. State, 814 So.2d 925, 945 (Ala.Crim.App.2000).
The trial court gave the jury a limiting instruction on the use of the prior conviction. This instruction was approved by the Supreme Court in Snyder v. State, [Ms. 1001539, December 14, 2001] ___ So.2d ___ (Ala.2001). Moreover, the trial court instructed the jury that counsel's arguments were not evidence in the case. We presume that the jury follows the court's instructions. Wilson v. State, 777 So.2d 856 (Ala.Crim.App.1999).

D.
Snyder next argues, for the first time on appeal, that the "State improperly instructed the jury on the law by simply substituting the facts of the case for the definition of intent." (Snyder's brief at page 94.)
During opening statement the prosecutor stated the following:
"Intentionally is defined in § 13A-2-2. Intentionally, a person acts intentionally with respect to a result or to conduct described by a statute defining an offense *547 when his purpose is to cause that result or engage in that conduct.
"I submit to you intentional killing type. Intentional killing is to point a pistol and fire, that result of you intentionally cause that result by pointing that during a burglary. During is defined in § 13A-5-39 as, the term used in section 13A-5-40(a), that's this, means in the course of or in connection with, commission of or in the immediate flight from the commission of the underlying felony or attempt thereof. That means during the commission or the attempted commission of that burglary in the first degree."
(R. 1055.)
Snyder's characterization of this issue is troubling. First, the prosecutor does not give the jury any instructions on the evidence. Second, the trial court clearly instructed the jury that arguments and statements of counsel were not to be considered as evidence. Jurors are presumed to follow the trial court's instructions. Taylor v. State, 666 So.2d 36, 70 (Ala.Crim.App.), on return to remand, 666 So.2d 71 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995).

E.
Snyder argues, for the first time on appeal, that the prosecutor argued facts not in evidence when he attempted to explain why the hair found in Dixie Gaither's hand did not match Snyder's. The prosecutor made the following argument:
"Folks, I am telling you, hair stuck to her hand, six of them are hers. One is so old that it can't be identified, which would indicate it had been there for some time, either a hair brush. She is sharing a hair brush. I am not speculating as to what it was. That's for you to decide, for you to discuss. Then there is one hair that's unidentified. It is stuck. It is not clasped. There are no roots stuck to the hair. They are broken hairs. I submit to you, folks, when you look at that sheet, you look at how she is pulled over and you look at that, it is obvious that the question about the hairs is resolving Dr. Warner. She's going down. She grabbed the couch, she grabbed something. She hits the floor and the hairs adhere to her hand."
(R. 3293-94.)
Clearly, the prosecutor was arguing a legitimate inference that could have been drawn from the evidence; specifically, the condition and placement of the bodies when they were discovered. A prosecutor may properly argue all legitimate inferences that may be drawn from the evidence presented. See Perkins.

F.
Snyder argues for the first time on appeal that the prosecutor invaded the province of the jury by asking the medical examiner the following question, "Her [Dixie Gaither's] overall general health prior to homicide, prior to death, in your characterization was what?" (R.2093.) Specifically, he argues that the prosecutor's use of the word "homicide" prejudiced him.
Here, there was no error. As soon as the prosecutor said "homicide" he immediately corrected himself and said "death." Last, we have reviewed all of the other challenged instances that Snyder argues denied him a fair trial. We conclude that there is no error, much less plain error, in any of the alleged instances of prosecutorial misconduct.

G.
Snyder also argues that the cumulative effect of the prosecutor's misconduct resulted in his being denied a fair trial. *548 We have found no instance of error in the prosecutor's conduct. As we stated in McGriff v. State, [Ms. CR-97-0179, August 31, 2000] ___ So.2d ___, ___ (Ala.Crim.App.2000) (opinion on return to remand), quoting Ferguson v. State, 814 So.2d 925, 950 (Ala.Crim.App.2000):
"`Ferguson contends that the cumulative effect of the prosecutor's alleged misconduct warrants a reversal of his conviction. Because we find that no single instance of the prosecutor's conduct was improper, any claim that the alleged improper conduct had a cumulative prejudicial effect on his trial is without merit and does not require a reversal. See Stewart v. State, 730 So.2d 1203 (Ala.Crim.App.1996), aff'd, 730 So.2d 1246 (Ala.), cert. denied, 528 U.S. 846, 120 S.Ct. 119, 145 L.Ed.2d 101 (1999); Hunt v. State, 642 So.2d 999 (Ala.Crim.App.1993), aff'd, 642 So.2d 1060 (Ala.1994).'"

XVI.
Snyder argues that the trial court jury instructions were deficient for several reasons. Specifically, Snyder argues that the instructions on the presumption of innocence and reconciling the witnesses' testimony were deficient.
After the jury instructions were given, defense counsel announced that he was satisfied with the instructions. There were no objections made to any jury instructions given in the guilt phase; therefore, we are limited to a plain-error analysis. See Rule 45A, Ala.R.App.P.
"`In setting out the standard for plain error review of jury instructions, the court in United States v. Chandler, 996 F.2d 1073, 1085, 1097(11th Cir.1993), cited Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), for the proposition that "an error occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner." Williams v. State, 710 So.2d 1276, 1306 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).'"
Broadnax v. State, 825 So.2d 134, 196 (Ala.Crim.App.2000), quoting Pilley v. State, 789 So.2d 870, 882-83 (Ala.Crim.App.1998). Moreover, "[w]hen reviewing a trial court's jury instructions, we must view them as a whole, not in bits and pieces, and as a reasonable juror would have interpreted them. Ingram v. State, 779 So.2d 1225 (Ala.Cr.App.1999)." Johnson v. State, 820 So.2d 842, 874 (Ala.Crim.App.2000).

A.
Snyder specifically argues that the trial court lessened the State's burden of proof by including the word "until" instead of "unless" in its instructions on the presumption of innocence. He argues in brief, "By using the word `until' in place of the word `unless,' the trial court informed the jury that a guilty verdict was expected." (Snyder's brief at page 111.)
The trial court gave the following instruction on the presumption of innocence:
"Now, in answer to the charges embraced in the indictment, the defendant has entered a plea of not guilty. Therefore, the burden of proof is on the State of Alabama. The defendant is always presumed to be innocent, and the fact that he has been indicted, arrested and brought before the bar of justice does not create any presumption against him at all. He comes into court clothed with a presumption of innocence, and it remains with him throughout the trial as a matter of evidence. It is an evidentiary fact which is to be considered by you, and it goes with him until it is overcome by evidence which proves his guilt to *549 each and every one of you jurors beyond a reasonable doubt.
"As I have already told you, the burden of proof is on the State of Alabama to prove the defendant guilty as charged. Before a conviction can be had in this case, the state must satisfy each and every member of the jury of the defendant's guilt beyond a reasonable doubt. Even if the state demonstrates a probability of guilty, if it does not establish it beyond a reasonable doubt, you must acquit the defendant."
(R. 3513-14.) The Alabama Supreme Court has used the word "until" to characterize the State's burden of proof. In Ex parte Scroggins, 727 So.2d 131, 134 (Ala.1998), the court stated, "The burden of proof in all criminal prosecutions rests upon the State, with the presumption of innocence attending the defendant until the burden of proof has been met." Also, we approved a similar instruction in Thomas v. State, 824 So.2d 1 (Ala.Crim.App.1999).
The trial court's jury instructions, when viewed as a whole, correctly informed the jury that if the State did not meet its burden, the jury had a duty to acquit the defendant. No reasonable juror would have concluded that the instructions implied that the State would always meet that burden. There was no error, much less plain error, in the trial court instruction on the presumption of innocence.

B.
Snyder also argues for the first time on appeal that the trial court erred in instructing the jury that it had a duty to reconcile the testimony of the witnesses. He asserts that such an instruction was improper and that we have specifically noted that a similar instruction was confusing. He cites Williams v. State, 601 So.2d 1062, 1076 (Ala.Crim.App.1991), in support of this contention.
The trial court gave the following instruction:
"It is the duty of the jury to reconcile all the testimony in the case and to make it speak the truth if you can do so. If you cannot, of course, it is a matter of discretion with the jury what testimony you will believe and what testimony you will disregard. You have a right to take all the testimony in the case, reject that which you think is untrue and consider only that part that you think is true. That applies to the testimony of all the witnesses in the case. If you think that a witness has told the truth as to some matter or matters and his testimony is inaccurate or his or her testimony is inaccurate or untrue as to another matter or matters, then you have a right in your discretion to believe that which you find to be true and disregard that which you think is untrue."
(R. 3515, emphasis added.) Snyder specifically takes offense with the above emphasized portion of the jury instruction.
In Williams v. State, 601 So.2d 1062 (Ala.Crim.App.1991), this Court specifically noted that the isolated instruction, "`You should, in the trial of this case, of course, attempt in every way you can to reconcile all of the evidence in this case so as, if possible, to make all witnesses speak the truth,'" 601 So.2d at 1076 (emphasis omitted), could be confusing when viewed in the abstract. This Court further stated:
"However, `[a] single instruction to a jury may not be judge in artificial isolation, but must be viewed in the context of the overall charge.' Kuenzel [v, State], 577 So.2d [474] at 517 [(Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991)]. The instruction was a charge on the jury's function as the sole factfinder. The jury has the `"responsibility *550 of assessing the credibility of each witness and weighing all the evidence, whether direct or circumstantial, as they viewed it." Cumbo v. State, 368 So.2d 871 (Ala.Crim.App.1978), cert. denied, 368 So.2d 877 (Ala.1979). Moreover, a conflict in the testimony is the sole province for the jury to determine....' Boggan v. State, 455 So.2d 228, 240 (Ala.Cr.App.1984). See also White v. State, 546 So.2d 1014 (Ala.Cr.App.1989). There was no plain error in the above instruction."
601 So.2d at 1076. The Alabama Supreme Court has held that a similar instruction did not amount to plain error. That Court, in Ex parte Musgrove, 638 So.2d 1360 (Ala.1993), stated:
"In Ex parte Holifield, [562 So.2d 254 (Ala.1990)] we found that a nearly identical jury instruction to reconcile the testimony so that the witnesses have spoken the truth was merely harmless error because the charge in its entirety `cured' the error found in that isolated instruction. 562 So.2d at 255. As previously noted, in review of a trial court's jury charge, individual instructions are not to be isolated or taken out of context, but must be considered in light of all the other instructions. Id.; Alexander [v. State], 601 So.2d [1130,] 1133 [(Ala.Crim.App.1992)]. In this case, the record reveals that the trial judge repeatedly instructed the jurors that they were to be the sole finders of fact and weighers of the witnesses' credibility."
638 So.2d at 1365.

C.
For the first time on appeal Snyder argues that the trial court's instruction on reasonable doubt violated Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), because it contained the phrase "moral certainty." In Cage v. Louisiana, the United States Supreme Court held that a court's use of the three phrases "grave uncertainty," "actual substantial doubt," and "moral certainty" to define reasonable doubt would cause a reasonable juror to believe that the State's burden of proof was lesser that what is actually necessary to convict. 498 U.S. at 41, 111 S.Ct. 328.
Here, the instruction given on reasonable doubt was virtually identical to the pattern jury instruction on reasonable doubt. The instruction did not contain the phrase "moral certainty."
"The reasonable doubt instruction given here was virtually identical to the pattern jury instruction on the burden of proof. The instruction did not contain the term `actual substantial doubt.' `"A trial court's following of an accepted pattern jury instruction weighs heavily against any finding of plain error."' Wilson v. State, 777 So.2d 856 (Ala.Cr.App.1999), quoting Price v. State, 725 So.2d 1003, 1058 (Ala.Cr.App.1997), aff'd, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999). Cf. Ex parte Wood, 715 So.2d 819 (Ala.), cert. denied, 525 U.S. 1042, 119 S.Ct. 594, 142 L.Ed.2d 536 (1998) (court noted that it had never held that following the pattern jury instruction may never amount to plain error).
"We have upheld a similar reasonable doubt instruction against a claim of plain error. Smith v. State, 756 So.2d 892 (Ala.Cr.App.1998)."
Smith v. State, 795 So.2d 788, 831 (Ala.Crim.App.2000).
The trial court's instructions on reasonable doubt were both thorough and accurate. The instruction did not contain the phrases condemned by the United States Supreme Court in Cage v. Louisiana. There was no error, much less plain error, *551 in the trial court's jury instructions on reasonable doubt.

XVII.
Snyder argues that Alabama's statutory system for compensating attorneys appointed to represent indigent defendants violates the separation-of-powers doctrine, constitutes a taking without just compensation, and deprives indigent capital defendants of effective assistance of counsel.[16]
Alabama's statutory scheme has consistently been upheld against the same constitutional attacks that Snyder raises in this case. See Duke v. State, 889 So.2d 1 (Ala.Crim.App.2002); Stallworth v. State, 868 So.2d 1128 (Ala.Crim.App.2001); Dorsey v. State, 881 So.2d 460 (Ala.Crim.App.2001).

Penalty-Phase Issues

XVIII.
Snyder challenges several of the trial court's jury instructions in the penalty phase. When reviewing a trial court's jury instructions, we must keep in mind the following standards:
"`"A trial court has broad discretion in formulating its jury instructions, providing those instructions accurately reflect the law and the facts of the case. Raper v. State, 584 So.2d 544 (Ala.Cr.App.1991). We do not review a jury instruction in isolation, but must consider the instruction as a whole, Stewart v. State, 601 So.2d 491 (Ala.Cr.App.1992), aff'd in relevant part, 659 So.2d 122 (Ala.1993), and we must evaluate instructions like a reasonable juror may have interpreted them. Francis v. Franklin, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985); Stewart v. State."'
"Griffin v. State, 790 So.2d 267, 332 (Ala.Crim.App.1999), quoting Ingram v. State, 779 So.2d 1225, 1258 (Ala.Crim.App.1999). `This court has consistently held that a trial court's oral charge to the jury must be viewed in its entirety and not in "bits and pieces." Parks v. State, 565 So.2d 1265 (Ala.Cr.App.1990); Williams v. State, 538 So.2d 1250 (Ala.Cr.App.1988); Lambeth v. State, 380 So.2d 923 (Ala.), on remand, 380 So.2d 925 (Ala.Cr.App.1979), writ denied, 380 So.2d 926 (Ala.1980).' Smith v. State, 585 So.2d 223, 225 (Ala.Crim.App.1991)."
Smith v. State, [Ms. CR-97-0069, December 22, 2000] ___ So.2d ___ (Ala.Crim.App.2000). The trial court has broad discretion in formulating its jury charges. Williams v. State, 611 So.2d 1119, 1123 (Ala.Crim.App.1992).
Also, after the jury instructions in the penalty phase Snyder announced that he was satisfied with the instructions. Therefore, we review these claims only for plain error. Rule 45A, Ala.R.App.P.

A.
Snyder argues, for the first time on appeal, that the trial court's jury instructions on weighing the aggravating and the mitigating circumstances were erroneous. Specifically, he contends that the trial court erred in not instructing the jury that it must recommend a sentence of imprisonment for life without the possibility of parole if the aggravating circumstances equaled the mitigating circumstances. Because Snyder announced that he was satisfied after the jury instructions were given in the penalty phase, we review this issue for plain error. Rule 45A, Ala.R.App.P.
*552 The trial court's instructions on weighing the aggravating and mitigating circumstances read, in part:
"The process of weighing the aggravating and mitigating circumstances against each other in order to determine the proper punishment is not a mathematical process. Your weighing of the circumstances against each other should not consist of merely adding up the number of aggravating circumstances and comparing that to the total number of mitigating circumstances. The law in this state recognizes that it is possible in at least some situations that one aggravating circumstance may outweigh a larger number of mitigating circumstances.
"The law in this state also recognizes that it is possible in at least some situations that a larger number of aggravating circumstances may be outweighed by one or a fewer mitigating circumstances.
"In other words, the law contemplates that different circumstances may be given different weights or values in determining the sentence in a case. And you, the jury, are to decide what weight or value is to be given to a particular circumstance in determining the sentence in light of all these other circumstances in the case. You must do that in the process of weighing the aggravating circumstance against the mitigating circumstance or circumstances.
"The weighing of the aggravating circumstances and the mitigating circumstance or circumstances to determine the sentence shall not be defined to mean a mere tallying of the aggravating circumstance and the mitigating circumstance or circumstances for the purpose of numerical comparison.
"....
"If a jury determines that no aggravating circumstances exist, it shall return a verdict recommending that the penalty be life imprisonment without parole. If a jury determines that one or more aggravating circumstance exists, but do not outweigh the mitigating circumstances, it shall return a verdict recommending that the penalty be life imprisonment without parole.

"If a jury determines that one or more aggravating circumstances exist, and that they outweigh the mitigating circumstances, if any, you shall return a verdict recommending the penalty be death."
(R. 3613-15, emphasis added.)
The Alabama Supreme Court in Ex parte Bryant, [Ms. 1990901, June 21, 2002] ___ So.2d ___ (Ala.2002), addressed a trial court's failure to instruct the jury that it could vote for death only when the aggravating circumstances outweighed the mitigating circumstances. The Bryant court distinguished its earlier holding in Ex parte Trawick, 698 So.2d 162 (Ala.1997), and finding plain error, stated:
"In the case now before us, the jury instructions erroneously allow the conclusion that the death penalty is appropriate even if the aggravating circumstances do not outweigh the mitigating circumstances so long as the mitigating circumstances do not outweigh the aggravating circumstances. The trial judge in this case did not add the caveat which sufficed in Trawick, [698 So.2d 162 (Ala.1997),], that the jury was to `recommend the death penalty only if [the jury] found that the aggravating circumstances outweighed the mitigating circumstances.' Trawick, 698 So.2d at 173. Indeed, at the end of the instructions on this topic, the trial judge implicitly told the jury that it might recommend death even if the jury did not find *553 an aggravating circumstance at all: `if you do not find that an alleged aggravating circumstance was proved, that does not automatically or necessarily mean that you should sentence Mr. Bryant to death....' (R. 1103, quoted supra.) (Emphasis added.)
"No other instructions by the trial court and no other feature of the record instills us with any confidence that the jury did not, within the parameters of the erroneous instructions, base the death penalty recommendation on a finding that the mitigating circumstances did not outweigh the aggravating circumstances even though the mitigating circumstances did equal the aggravating circumstances. Such a recommendation would be contrary to § 13A-5-46(e)[, Ala.Code 1975]. Therefore, the erroneous jury instructions on the topic of weighing the aggravating circumstances and the mitigating circumstances constitute plain error."
___ So.2d at ___.
We find the jury instructions in this case more akin to the instructions approved by the Alabama Supreme Court in Ex parte Trawick, a case that was not overruled by the Supreme Court's subsequent holding in Ex parte Bryant. In upholding the jury instruction the Ex parte Trawick court stated:
"The trial court instructed the jury that, if it found that the mitigating circumstances outweighed the aggravating circumstances, it was required to recommend a sentence of life imprisonment without parole. However, Trawick points out that the trial court did not further instruct the jury that if the aggravating and mitigating circumstances were equally balanced, the jury was likewise required to recommend a sentence of life imprisonment. Trawick concludes that, because Alabama law requires that aggravating circumstances must outweigh mitigating circumstances in order for a jury to recommend the death sentence, the trial court's instructions misstated Alabama law and improperly created an inference that the jury was required to recommend the death penalty if it found that the circumstances were equally balanced.
"Because Trawick did not raise this issue at trial, we must consider it in accordance with the plain error rule. We note that the jury instructions as to the weighing of aggravating circumstances and mitigating circumstances were materially the same as those set out in the Alabama Pattern Jury Instructions: Criminal for use in the sentencing stage of a capital murder trial in this state, and this Court has held that no reversible error will be found when the trial court follows the pattern jury instructions adopted by this Court. Kuenzel v. State, [577 So.2d 474 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991)]. The trial court correctly instructed the jury to recommend the death penalty only if it found that the aggravating circumstances outweighed the mitigating circumstances, obviously implying that in all other circumstances the jury was required to recommend a sentence of life imprisonment without parole. We do not agree with Trawick that this instruction could have misguided the jury as to its responsibility and function in weighing the aggravating and mitigating circumstances; on the contrary, the instruction clearly explained that the jury could recommend the death penalty under only one circumstance. Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), affirmed, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d *554 687 (1993). We therefore find no plain error in the instruction as given."
698 So.2d at 173-74.[17]
We can say with confidence, unlike the Bryant court, that there was no possibility that the jury considered the instructions to mean that it could vote for the death penalty only if the aggravating and the mitigating circumstances were assessed equal weights. The instruction in this case informed the jury that the only time it could vote for death was when the aggravating circumstances outweighed the mitigating circumstances. There was no plain error in the trial court jury instructions on weighing the aggravating and the mitigating circumstances. See Clark v. State, [Ms. CR-99-1062, June 27, 2003] ___ So.2d ___, ___ (Ala.Crim.App.2003); McNabb v. State, 887 So.2d 929, 994 (Ala.Crim.App.2003) (on rehearing).

B.
Snyder argues for the first time on appeal that the trial court's jury instructions implied that the jury could find aggravating circumstances that were not contained in the statute because the trial court said at one point, "If a jury determines that one or more aggravating circumstances exist...."
Here, the only aggravating circumstance that was argued by the State was that the murders occurred during a burglary.[18] The trial court during his jury instructions stated:
"An aggravating circumstance is a circumstance specified by law which indicates or tends to indicate that a defendant should be sentenced to death.
"....
"However, what I have just said to you will be subject to further instructions that I will explain to you later relative to the aggravating circumstance as follows: The capital offense was committed while the defendant was engaged or was an accomplice in the commission of or an attempt to commit or flight after committing or attempting to commit burglary. That's one of the eight aggravating circumstances, and it is not necessary for me to define the other seven because I have determined as a matter of law that and based on their opening statement, that there is no request for that or evidence relative to that for your consideration.

"....
"Now, the aggravating circumstance that you may consider in this case is number four on the list o eight that I have just mentioned to you, and that is *555 as follows: The capital offense was committed while the defendant was engaged or was an accomplice in the commission of or an attempt to commit or the flight after committing or attempting to commit burglary. As to this aggravating circumstance, the Court instructs you that this circumstance was proved by your verdict in the guilt phase of the trial.
"Now, the burden is on the State of Alabama to convince each of you beyond a reasonable doubt as to the existence of any aggravating circumstance considered by you in determining what means that before you can consider recommending that a defendant's punishment be death, each and every one of you must be convinced beyond a reasonable doubt based on the evidence that we least one aggravating circumstance exists, and I charge you that at least one aggravating circumstance does exist, which is proven by your verdict in the guilt phase.
"You may not consider any aggravating circumstance other than the aggravating circumstance for which I have instructed you. And you may not consider an aggravating circumstance unless you are convinced by the evidence beyond a reasonable doubt the existence of that aggravating circumstance in this case. And as I have told you, there is one aggravating circumstance that you can consider in this case, and that was the one that you found in the guilt phase of the proceeding.

"....
"In respect to this, I charge you that the state has proved beyond a reasonable doubt one aggravating circumstance as follows: The capital offense was committed while the defendant was engaged or was an accomplice in the commission of or an attempt to commit or flight after committing or attempting to commit burglary. That was done by your verdict in this case at the conclusion of the guilt phase of the trial."
(R. 3603-09; emphasis added.)
A review of the trial court's instruction reveals that the trial court told the jury not once, but three times, that the only aggravating circumstance it could consider was the one proven in the guilt phase  murder during the course of a burglary. There was no plain error in the trial court's jury instructions on aggravating circumstances.

C.
Snyder also argues for the first time on appeal that the jury instructions denigrated the jury's sense of responsibility by repeatedly instructing the jury that its sentencing verdict was a recommendation.
"`[W]e reaffirm the principle that, in Alabama, the "judge, and not the jury, is the final sentencing authority in criminal proceedings." Ex parte Hays, 518 So.2d 768, 774 (Ala.1986); Beck v. State, 396 So.2d [645] at 659 [(Ala.1980)]; Jacobs v. State, 361 So.2d 640, 644 (Ala.1978), cert. denied, 439 U.S. 1122, 99 S.Ct. 1034, 59 L.Ed.2d 83 (1979).' Ex parte Giles, 632 So.2d 577, 583 (Ala.1993), cert. denied, [512] U.S. [1213], 114 S.Ct. 2694, 129 L.Ed.2d 825 (1994). `The jury's verdict whether to sentence a defendant to death or to life without parole is advisory only.' Bush v. State, 431 So.2d 555, 559 (Ala.Crim.App.1982), aff'd, 431 So.2d 563 (Ala.1983), cert. denied, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983). See also Sockwell v. State, [675] So.2d [4] (Ala.Cr.App.1993). `We have previously held that the trial court does not diminish the jury's role or commit error when it states during the jury charge in the penalty phase of a death *556 case that the jury's verdict is a recommendation or an "advisory verdict." White v. State, 587 So.2d 1218 (Ala.Cr.App.1990), aff'd, 587 So.2d 1236 (Ala.1991), cert. denied, 502 U.S. 1076, 112 S.Ct. 979, 117 L.Ed.2d 142 (1992).' Burton v. State, 651 So.2d 641 (Ala.Cr.App.1993)."
Taylor v. State, 666 So.2d 36, 50-51 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995).
There was no error, much less plain error, in the trial court's instructions that the jury's verdict in the penalty phase was a recommendation.

D.
Snyder argues that the cumulative effect of the trial court's errors in its instructions entitles him to a new trial.
The Alabama Supreme Court in Ex parte Bryant, [Ms. 1990901, June 21, 2002] ___ So.2d ___ (Ala.2002), recognized that there may be instances where the cumulative effect of erroneous instructions will result in reversible error. However, this is not such a case. We have found no error in the trial court's jury instructions. "'"Because we find no error in the specific instances alleged by the appellant, we find no cumulative error."'" Lacy v. State, 673 So.2d 820-825 (Ala.Crim.App.1995), (quoting Chandler v. State, 615 So.2d 100, 110 (Ala.Crim.App.1992), quoting in turn other cases).

Sentencing Order

XIX.
Last, as required by § 13A-5-53, Ala.Code 1975, we will address the propriety of Snyder's sentence to death. Snyder was indicted and convicted of three counts of capital murder for murdering Nancy Burkhalter, Dixie Gaither, and Carey Gaither during the course of a burglary and one count of capital murder for killing two or more people during one course of conduct.[19]
The record clearly shows that Snyder's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. Section 13A-5-53(b)(1).
The trial court found as an aggravating circumstance that the murders occurred during the course of a burglary. Section 13A-5-40(a)(4), Ala.Code 1975. The trial court found as a mitigating circumstance that Snyder had no significant history of prior criminal activity. Section 13A-5-51 (1), Ala.Code 1975.
Snyder claims, for the first time on appeal, that the trial court considered hearsay evidence of his bad reputation when it considered the appropriate sentence. The record reflects that during the sentencing hearing before the trial court the parties reviewed the presentence report and requested that various portions be deleted. The following occurred:
"[Defense counsel]: Your, Honor, then I would ask the Court to look at page 12, maybe the last page of the report. In *557 the last paragraph it states he, being the defendant, was known by law enforcement authorities to be involved in stealing and using drugs. We would just say, number one, that would be hearsay, and, number two, we do understand that the defendant's record as far as his convictions, and he, of course, admits to those. But as far as, you know, the reputation as known by law enforcement, we haven't heard from that. So we would ask that that be stricken also.
"The Court: What says the state?
"[Prosecutor]: Judge, I think if you look at his record from the presentence investigation, based on his prior felony conviction, it was for theft, and there was also, if you look in the presentence investigation, a conviction for possession of marijuana in the second degree. So I think that's a fair statement.
"The Court: Okay. I am going to leave that in there. However, relative to any activity, for the record, relative to criminal activity, I am only going to consider the record in this case relative to his particular offense and anything set out as to prior convictions. And as I understand it, he has one prior felony conviction being CC-88-50 in Talladega County where he was represented by counsel."
(R. 3647-48.) It is clear that the trial court did not consider any conviction except the felony conviction for theft of property. Also, the trial court found one statutory mitigating circumstance  that Snyder had no significant history of prior criminal activity. A review of the trial court's remarks and the sentencing order shows that the trial court did not consider any reputation evidence about prior bad acts.
Snyder also argues for the first time on appeal that the trial court erred in failing to find any nonstatutory mitigating circumstances. Specifically, Snyder argues that the trial court should have found that he was a youth choir director, that he was employed before the murders, and that he was liked by others in the community. The trial court stated the following in regard to nonstatutory mitigating circumstances:
"The Court has made a diligent search under the provisions of Title 13A, Chapter 5, Section 52, 1975 Code of Alabama, as amended, the evidence offered by the Defendant, the aspects of the presentence investigation report favorable to the Defendant on mitigation to determine if there is any aspect of the Defendant's character or record, or any circumstances of the offense for which he had been convicted that would constitute mitigating circumstance, and finds that there is only one mitigating circumstance and that is the statutory mitigating circumstance found hereinabove. The Court finds that there are no nonstatutory mitigating circumstances in this case."
(R. 21.) The remarks made in the sentencing order show that the trial court considered everything before it but found no nonstatutory mitigating circumstances. As the Alabama Supreme Court has stated:
"See Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); Ex parte Hart, 612 So.2d 536, 542 (Ala.1992) (`Lockett does not require that all evidence offered as mitigating evidence be found to be mitigating.'), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993); and Ex parte Slaton, 680 So.2d 909, 924 (Ala.1996) ('"While Lockett and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority."')(quoting Bankhead v. State, *558 585 So.2d 97, 108 (Ala.Crim.App.1989), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997))."
Ex parte Ferguson, 814 So.2d 970, 975 (Ala.2001). The trial court complied with Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and we agree with the trial court's findings.
However, as required by § 13A-5-53(b)(2), Ala.Code 1975, this Court must independently weigh the aggravating and the mitigating circumstances to determine the propriety of Snyder's death sentence. After an independent weighing, we are convinced, as was the trial court, that Snyder's sentence of death is the appropriate sentence in this case.
As further required by § 13A-5-53(b)(3), Ala.Code 1975, we must address whether Snyder's sentence was disproportionate or excessive when compared to the penalties imposed in similar capital cases. Snyder brutally murdered two people by bludgeoning them to death and murdered another person by shooting her three times in the head. He then stole items from Dixie Gaither's home. Snyder's sentence is neither disproportionate or excessive when compared to the sentences in other cases. See Neal v. State, 731 So.2d 609 (Ala.Crim.App.1997), aff'd, 731 So.2d 621 (Ala.1999); Knotts v. State, 686 So.2d 431 (Ala.Crim.App.1995), aff'd, 686 So.2d 486 (Ala.1996); Barbour v. State, 673 So.2d 461 (Ala.Crim.App.1994), aff'd, 673 So.2d 473 (Ala.1995).
Last, we have searched the entire record for any error that may have adversely affected Snyder's substantial rights and have found none. Rule 45A, Ala.R.App.P.
Snyder's convictions and sentence of death are due to be, and are hereby, affirmed.
AFFIRMED.
WISE, J., concurs; McMILLAN, P.J., and COBB and SHAW, JJ., concur in the result; BASCHAB, J., dissents.
BASCHAB, Judge, DISSENTING.
For the reasons set forth below, I must respectfully dissent.

I.
The appellant argues that the trial court improperly refused to allow him to introduce evidence that showed that another person committed the capital offenses. (Issue I in the appellant's brief.) Specifically, the trial court refused to allow him to present evidence, which it described as hearsay, concerning conversations witnesses had with Carey and Nancy regarding Singleton. In refusing to admit the evidence, the trial court relied on this court's decision in Griffin v. State, 790 So.2d 267 (Ala.Crim.App.1999). However, the Alabama Supreme Court reversed our decision in Ex parte Griffin, 790 So.2d 351 (Ala.2000), and set forth a three-part test for determining whether such evidence is admissible. That test is set forth in the majority opinion.
In this case, the appellant sought to admit evidence that Eugene Singleton committed the murders. In support thereof, he made the following proffer: that Singleton was initially a suspect in this case; that, in late 1982 or early 1983, Dixie and Milton Gaither cooperated with the prosecution, and Milton Gaither testified adversely to Singleton during the trial of Singleton's co-conspirator; that Singleton had subsequently pled guilty and had been sent to prison; that Singleton had been released on parole on or about February 21, 1994; that the district attorney had instructed a deputy to go to the victims' house and inform them that Singleton had been released on parole and to determine whether Singleton had contacted them or *559 caused them any problems;[20] that Carey and Nancy had told friends that Singleton had been released from prison, that he had made telephone calls to Dixie, and that they were scared for their lives; that Nancy had told a friend that detectives had been to their house, spoken to Carey, and told him they knew Singleton had been calling; that Carey had told a friend about previous testimony against Singleton and that he and Dixie had turned State's evidence against Singleton; that Nancy and/or Carey had told a friend that detectives or someone had been watching their house after Singleton was released from prison; that Singleton had made threats toward the Gaithers to other people; that Singleton had told one witness "he wouldn't have ever thought that Dixie and them would have done him that way"; and that witnesses had seen Singleton in the Talladega area around the time of the murders. (R. 2712.)
The defense's proffer satisfies the first two prongs of the test set forth in Ex parte Griffin. Therefore, the appellant's right to present his defense supersedes the hearsay rule in this case. Accordingly, the trial court improperly relied on the hearsay rule to prevent the appellant from presenting evidence concerning conversations witnesses had with Carey and Nancy regarding Singleton.

II.
The appellant also argues that the trial court did not properly instruct the jury on the balancing test for determining a defendant's sentence. (Issue X in the appellant's brief.) Specifically, he contends that the trial court erred because it did not instruct the jury that it must recommend a sentence of imprisonment for life without the possibility of parole if the aggravating circumstance equaled the mitigating circumstance or circumstances. After reviewing the trial court's instructions and the Alabama Supreme Court's decisions in Ex parte Bryant and Ex parte Trawick, I conclude that the instructions in this case could have allowed the jury to recommend a sentence of death even if the aggravating circumstance equaled the mitigating circumstance or circumstances, as did the instructions in Ex parte Bryant. Therefore, the trial court's erroneous jury instructions on the weighing of the aggravating circumstance and the mitigating circumstance or circumstances constituted plain error. See Rule 45A, Ala. R.App. P.

III.
Finally, the appellant raises several arguments concerning the testimony of his brother, Butch Snyder. A brief recitation of the relevant facts will aid in understanding my analysis of these arguments.
Initially, the trial court determined that Butch was hostile to the State and agreed to allow him to be called as a court's witness. As a result, the State was allowed to cross-examine and to lead him when it questioned him. Therefore, during his examination of Butch, the prosecutor asked numerous leading questions and used transcripts of statements Butch had previously made to law enforcement officers. In some instances, after Butch had given testimony that was inconsistent with his prior statements, the prosecutor asked questions about and read inconsistent portions of the previous statements and gave Butch an opportunity to admit or deny having made them. However, in other instances, even though Butch had not given testimony that was inconsistent with his prior statements, the prosecutor nevertheless read parts of the transcripts of the prior statements, including a description of *560 some evidence, statements about disposing of evidence in Alabama, and statements about going to Georgia to dispose of evidence. The prosecutor also read portions of Butch's statements about conversations he had had with the appellant and about his assumption or belief that the appellant's statements meant he had committed the murders. Some portions of the transcripts the prosecutor read were consistent with Butch's testimony, some were inconsistent, and some covered areas about which Butch had not yet testified.
Subsequently, the prosecutor played the entire audiotapes of two statements Butch had previously made to law enforcement officers. Some of the information on the audiotapes included the portions of the transcripts the prosecutor had used in questioning Butch. Parts were consistent with Butch's testimony, and other parts were inconsistent with his testimony. However, the audiotapes also included other information, including more details about the appellant's actions after the murders. Most troubling, however, were Butch's references to the fact that he figured the appellant must have stolen some jewelry again because he had been known, once or twice in the past, to see something and to take it, and a reference to the fact that the murders could have been drug-related.

A.
First, the appellant argues that the prosecutor introduced portions of Butch's prior statements before he gave conflicting testimony. (Issue III in the appellant's brief.) The prosecution could have properly used Butch's prior inconsistent statements to impeach his testimony once he gave conflicting testimony. However, the appellant correctly asserts that, in some instances, the prosecutor improperly read portions of the statements before he elicited conflicting testimony from Butch. In those instances, his use of the prior statements was not proper.

B.
Second, the appellant argues that the prosecutor improperly bolstered Butch's testimony by playing the entire audiotapes of the statements, which contained prior consistent statements. (Issue III in the appellant's brief.) In some respects, Butch's prior statements were consistent with his testimony during the trial.
"Generally, the proponent of a witness may not bolster the credibility of a witness by showing that he made similar statements on prior occasions. Macum [Marcum] v. State, 39 Ala.App. 616, 107 So.2d 899 (Ala.Cr.App.1958)."
Varner v. State, 497 So.2d 1135, 1137 (Ala.Crim.App.1986). To the extent the prosecutor used Butch's prior statements to bolster Butch's credibility, such conduct was improper.

C.
Third, the appellant argues that Butch's prior statements constituted inadmissible hearsay. (Issue III in the appellant's brief.) Rule 801(d), Ala. R. Evid., provides, in part:
"Statements that are not hearsay. A statement is not hearsay if 
"(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition...."
(Emphasis added.)
"A prior inconsistent statement of a witness who is not a defendant, although *561 useable for impeachment purposes, cannot be used as substantive evidence of an accused's guilt unless (1) the witness was under oath and subject to the penalty of perjury at the time the prior statement was made, (2) the witness is subject to cross-examination, and (3) the statement was given in an appropriate proceeding, such as a hearing before a grand jury, a prior trial, or a deposition. Hooper v. State, 585 So.2d 137 (Ala.1990); Reese v. State, 671 So.2d 126 (Ala.Cr.App.1995). See also C. Gamble, McElroy's Alabama Evidence, § 159.02(1) (5th ed.1996); Patrick v. Femco Southeast, Inc., 590 So.2d 259, 261-62 (Ala.1991)."
Lindley v. State, 728 So.2d 1150, 1151 (Ala.Crim.App.1997), aff'd in part, rev'd on other grounds in part, 728 So.2d 1153 (Ala.1998) (footnote omitted).
The majority concludes that Butch's second statement did not constitute hearsay because he made it under oath before a notary public. However, for a prior inconsistent statement not to constitute hearsay, the plain language of Rule 801(d)(1)(A), Ala. R. Evid., requires, in part, that the statement be "given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition." (Emphasis added.) Contrary to the majority's conclusion, it does not appear that Butch was "under oath subject to the penalty of perjury" at the time he made any of the prior statements. Also, he did not make the statements in any type of appropriate, presumably judicial, proceeding. See Lindley, supra. Therefore, Butch's statements were not admissible as substantive evidence of the appellant's guilt. Nevertheless, the trial court did not, at any time, instruct the jury that Butch's statements were admissible for impeachment only and that they could not be used as substantive evidence of his guilt. Because of the substance of some of those statements, as set forth more fully herein, error occurred in this regard.

D.
Fourth, the appellant argues that the audiotapes of Butch's statements improperly made references to his prior bad acts. (Issue II in the appellant's brief.) Specifically, the audiotapes included Butch's reference to the fact that the appellant had stolen jewelry before and to the fact that the murders may have been drug-related.
"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."
Rule 404(b), Ala. R. Evid.
"`Evidence of other and distinct crimes is as a general rule not admissible.' Vincent v. State, 231 Ala. 657, 660, 165 So. 844, 846 (1936).
"`"This exclusionary rule is simply an application of the character rule which forbids the state to prove the accused's bad character by particular deeds. The basis for the rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has almost an irreversible impact upon the minds of the jurors."'
"Ex parte Arthur, 472 So.2d 665, 668 (Ala.1985) (quoting Charles W. Gamble, McElroy's Alabama Evidence, § 69.01(1) (3d ed.1977)).
"`The well-established exceptions to the exclusionary rule include: (1) relevancy to prove identity; (2) relevancy to prove res gestae; (3)relevancy to prove scienter; (4) relevancy to prove intent; (5) relevancy to show motive; (6) relevancy to prove system; (7) relevancy to prove malice; (8) relevancy *562 to rebut special defenses; and (9) relevancy in various particular crimes.'
"Stallworth v. State, 662 So.2d 1222, 1224 (Ala.Crim.App.1995) (quoting earlier cases)....
"....
"This Court has held that the exclusionary rule prevents the State from using evidence of a defendant's prior bad acts to prove the defendant's bad character and, thereby, protects the defendant's right to a fair trial. See Ex parte Cofer, 440 So.2d 1121, 1123 (Ala.1983).
"`Evidence of prior bad acts of a criminal defendant is presumptively prejudicial to the defendant. It interjects a collateral issue into the case which may divert the minds of the jury from the main issue. Kilpatrick v. State, 51 Ala.App. 352, 285 So.2d 516 (1973), cert. denied, 291 Ala. 628, 285 So.2d 525 (1973). Therefore the admission of such evidence constitutes reversible error. Hinton v. State, 280 Ala. 48, 189 So.2d 849 (1966).'
"Ex parte Cofer, 440 So.2d at 1124. See also Ex parte Lacy, 639 So.2d 951 (Ala.1993); Ex parte Smith, 581 So.2d 531, 534 (Ala.1991); Ex parte Arthur, 472 So.2d 665 (Ala.1985); Dozier v. State, 596 So.2d 49 (Ala.Crim.App.1991)."
Ex parte Drinkard, 777 So.2d 295, 300-02 (Ala.2000).
In this case, the record does not indicate that the appellant's alleged prior bad acts were relevant to any issue at trial. See Ex parte Vaughn, 869 So.2d 1090 (Ala.2002). Rather, they were completely collateral to the crimes with which he was charged. See Drinkard, supra. Finally, the trial court did not instruct the jury that it could not use the alleged prior bad acts as substantive evidence of the appellant's guilt. Therefore, error occurred in this regard, and that error was not harmless.

E.
Fifth, the appellant argues that the trial court improperly allowed Butch to comment on the ultimate issue of whether he was guilty. (Issue IV in the appellant's brief.) Butch indicated in his statements, and the prosecutor emphasized the indication, that he thought the appellant was guilty of the murders.
"Testimony in the form of an opinion or inference otherwise admissible is to be excluded if it embraces an ultimate issue to be decided by the trier of fact."
Rule 704, Ala. R. Evid. Because an ultimate issue in this case was whether the appellant committed the offense, it appears that portions of the transcripts and the audiotapes violated Rule 704, Ala. R. Evid.

F.
Sixth, the appellant argues that the trial court improperly admitted hearsay evidence about his alleged confession to Butch. (Issue VI in the appellant's brief.) Butch's statements included references to the appellant's statements that he "did it" and that his life was in Butch's hands. Because Butch's prior statements were admissible, in part, only for impeachment purposes, the evidence in Butch's statements regarding the appellant's confessions was admissible for impeachment purposes only. However, the trial court did not instruct the jury that it could not use those statements as substantive evidence of the appellant's guilt. Therefore, error occurred in this regard.

G.
Seventh, the appellant argues that portions of Butch's statements were improperly placed before the jury multiple times. (Issue III in the appellant's brief.) In addition to reading parts of the statements *563 into evidence while questioning Butch, the prosecutor then played both audiotapes in their entirety for the jury. Therefore, some of the information in the statements was placed before the jury multiple times. For the reasons set forth herein, error occurred because some of that information should not have been before the jury or the trial court should have instructed the jury on its limited admissibility.
Each of these considerations, taken individually, is troubling, even if not reversible. However, taken cumulatively in the context of this trial, including the other errors set forth in this opinion, plain error occurred in the admission of Butch's prior statements, particularly when the trial court allowed the prosecutor to play the entire audiotapes of two of the statements. Finally, under the circumstances of this case, the error was not harmless.
Based on the above-referenced errors, I do not believe this case will withstand the many levels of judicial scrutiny that occur when a defendant is convicted of a capital offense and sentenced to death. Accordingly, this court should reverse the appellant's convictions and remand this case to the trial court for a new trial.
NOTES
[1] It appears from the record that Carey Gaither lived with Nancy Burkhalter and was visiting his mother at the time of the murders.
[2] Snyder states in his brief that Snyder's parents met with Jonathan Adams; however, the record of the hearing on this issue reflects that it was Snyder's mother and one of her daughters who met with Adams. (S.R.73.)
[3] Prior to the 1997 amendment, this rule provided that the jury could separate during the trial of a capital felony only if the parties consented in open court to the separation.
[4] The Bethea Court specifically stated that because any error was harmless it would not reach the question whether the juror should have been removed for cause.
[5] Though the trial court appeared to apply the standard for a hostile witness and not a court witness, this Court may affirm a lower court's ruling if it is correct for any reason. "A trial court's judgment, if correct, should be affirmed even if the court has given a wrong reason in support of its judgment." Ex parte City of Fairhope, 739 So.2d 35, 39 (Ala.1999).
[6] Section 36-20-5, Ala.Code 1975, specifically authorizes a notary public to administer oaths.
[7] Snyder also argues in his brief to this Court that the State failed to disclose the notes made by another investigator who was present with Surrett during the questioning. However, there is no indication that this investigator made any notes.
[8] Milton Gaither, Dixie's husband, had been dead for approximately one year at the time of Dixie's death.
[9] Snyder also argues that the trial court erred in failing to give the jury a limiting instruction on the use of Snyder's prior conviction. This Court originally reversed the judgement in this case because of the trial court's failure to give a full jury instruction on the use of Snyder's prior conviction. However, the Alabama Supreme Court reversed this Court's judgment and stated that given the facts of the case the limiting instruction was sufficient. See Snyder v. State, 893 So.2d 482, 487 (Ala.2001) (plurality opinion). That Court stated:

"Unlike the circumstances in Ex parte Minor, [780 So.2d 796 (Ala.2000),] where the jury could have used the testimony for whatever purpose it desired  to determine a witness's credibility or as substantive evidence of the defendant's guilt  the trial court in this case informed the jury that the prior-conviction evidence had `one purpose' and that that purpose was to determine credibility; consequently, it eradicated the necessity of informing the jury that it would be improper to use the evidence as substantive evidence of guilt."
[10] We do not know the specifics surrounding the earlier conviction. However, the record shows that defense counsel and the court were given certified copies of the prior conviction and that the trial court was aware of the facts of the prior case.

If we were to calculate the date from the date that Snyder's probationary period ended and the date of trial the conviction would be less than 10 years old. However, Rule 609, Ala.R.Evid., is patterned after Rule 609, Fed.R.Evid. Before the 1972 amendment of Rule 609, Fed.R.Evid., Rule 609(b), read, "Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the release of the witness from confinement imposed for his most recent conviction, or the expiration of the period of his parole, probation, or sentence granted or imposed with respect to his most recent conviction, whichever is the later date." (Emphasis added.) This rule was amended in 1972 to read as it now reads, the same as Rule 609(b), Ala.R.Evid.  it deleted the references to the expiration of parole or probation. Federal caselaw specifically holds that the time period in the federal rule will not include a probationary period. See United States v. Sims, 588 F.2d 1145 (6th Cir.1978). Alabama has never had occasion to address this issue.
[11] The Advisory Committee's Notes to Rule 102, Ala.R.Evid., state, in part:

"These rules have been modeled, except where a different treatment was deemed justified for Alabama practice, after the Federal Rules of Evidence, and much of the material in the advisory notes is devoted to a discussion of whether the Alabama Rule of Evidence is identical to or different from its counterpart under the Federal Rules of Evidence. The committee assumes, consequently, that cases interpreting the Federal Rules of Evidence will constitute authority for construction of the Alabama Rules of Evidence.... Cases interpreting the federal rules, however, are persuasive rather than mandatory authority before the Alabama courts."
[12] Snyder offers as an aside to this argument that the court's overruling the admission of the crime-scene videotape of Nancy Burkhalter's murder scene was "particularly egregious" because there was no proper predicate for its admission. However, this is totally unsupported by the record. Before this tape was admitted, Lt. Edwin Eugene Jacks of the Talladega Police Department testified that the videotape was an accurate depiction of the crime scene. This was sufficient to establish a proper predicate for its admittance. See Johnson v. State, 823 So.2d 1 (Ala.Crim.App.2001).
[13] Throughout Snyder's argument he refers to a Dr. Walker; however, the record shows that the doctor's name was Dr. Kenneth Warner. (R.2062.)
[14] It appears that some of the confusion in this case occurred because during the prosecution of Snyder's case there were two different directors for the Birmingham laboratory. (R. 1746.)
[15] This rule states:

"No judgment may be reversed or set aside, nor new trial granted in any civil or criminal case on the ground of misdirection of the jury, the giving or refusal of special charges or the improper admission or rejection of evidence, nor for error as to any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties."
[16] Section 15-12-21, Ala.Code 1975, specifically addresses the compensation of counsel appointed for trial work. This section was amended in 1999 to remove the cap on the fees an attorney may receive when representing an indigent defendant in a capital case.
[17] The facts of this case are further distinguishable from Ex parte Bryant, because Snyder waived the presentation of any mitigating evidence. He made the following request:

"I wish to make known to this Court that it is my desire to not have any of my family take the stand in order to beg for my life. I do not want that for any of them. I don't want them to have to live with that, and I ask this Court to not allow it.
"....
"I would only ask one thing more of you. And that's to give my family an opportunity for closure, to give them a chance to quit mourning my life. Do not subject them to the next 50 years of life in prison. Return to this Court a recommendation of death. Being found guilty of killing three friends that I did not kill, it is my desire to be executed, and I pray this jury and this Court will abide by these wishes."
(R. 3584-87.)
[18] The aggravating circumstances are defined in § 13A-5-49, Ala.Code 1975. This section was amended in 1999 to add the aggravating circumstance, "The defendant intentionally caused the death of two ore more persons by one act or pursuant to one scheme or course of conduct." § 13A-5-49(9). This aggravating circumstance does not apply in this case because the murders occurred before the effective date of the amendment of this statute.
[19] This case is not affected by the United States Supreme Court's holding in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Snyder was convicted of killing the victims during the course of a burglary. The felony that elevated the crime to a crime punishable by death  burglary  was found by the jury beyond a reasonable doubt in the guilt phase. There is no Ring violation in this case. See Ex parte Waldrop, 859 So.2d 1181 (Ala.2002).

Neither is there any evidence that the death sentence imposed on Snyder violated Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), by imposing the death sentence on a mentally retarded individual. There is no evidence indicating that Snyder is retarded. In fact, at the time of the murders he owned his own business. There is no Atkins violation. See Ex parte Perkins, 851 So.2d 453 (Ala.2002).
[20] At that time, the victims told the deputy they had not heard from Singleton.